UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONALD JORDAN, ROBERT McKAY, and THE MBTA POLICE PATROLMAN'S UNION, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>JOSEPH C. CARTER, individually and as Chief of the MBTA Police Department, and THE MBTA POLICE DEPARTMENT, )<br><br>Defendants. ) | Civil Action No. 04-10927-RGS |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS**

**INTRODUCTION**

The individual plaintiffs, Ronald Jordan and Robert MacKay, were officers of the MBTA Police Department (the "Department") who were caught making improper requests for criminal offender record information ("CORI") on recorded Department telephone lines. Those recorded calls also include a number of exchanges, frequently profane, in which Jordan, MacKay, and other officers expressed criticism of and disrespect for senior officers in the Department, including defendant Joseph C. Carter, the Chief of the MBTA Police (the "Chief").

Plaintiffs' claim that the subsequent discipline imposed on them violated their constitutional rights fails as a matter of law. The First Amendment protects only speech on matters of public concern, and grants public employers – particularly police departments – wide latitude to regulate disruptive speech by employees, including

speech that on its face addresses matters that might be of public interest.  The statements in question are properly before this Court, and the relevant threshold tests on which defendants base this motion present solely questions of law.  Plaintiffs have failed to state a claim, and defendants are entitled to judgment on the pleadings.

STATEMENT OF FACTS[1]

The two individual plaintiffs, Ronald Jordan and Robert MacKay, are former officers of the Department who engaged in a number of conversations on regularly recorded Department telephone lines.  Complaint ¶¶5, 8-9.  At the time the Complaint was filed, they were on paid administrative leave.  Id. ¶6.  Plaintiffs contend that this adverse action was taken against them because of the recorded conversations, and specifically because of four categories of statements that they made: (a) requesting criminal offender record information ("CORI") concerning several individuals; (b) criticizing the Chief of the MBTA Police (defendant Carter) and other senior officers in the Department; (c) calling Chief Carter "No Show Joe," and complaining about his alleged absenteeism; and (d) discussing recent crimes at the Dudley Station of the MBTA.  See Complaint ¶8.  They allege that the Department's review of the recordings was "arbitrary and did not serve a legitimate business purpose," id. ¶11, though they acknowledge that written Department policies notify police officers that recordings may be reviewed "for investigative purposes" or "when requested by the MBTA Legal Department or court order."  Id. ¶12.  Plaintiffs allege that the disciplinary action violated their rights to free speech and association under the federal Constitution and

---

[1] In accordance with the requirements of Fed. R. Civ. P. 12(c), we review here only the allegations of the Complaint and related matters that the Court may consider on motions under that Rule, without conceding the accuracy of any of those allegations.  In particular, defendants do not concede that plaintiffs were disciplined for all of the statements they allege, but accept the allegations of the Complaint solely for purposes of this motion.

the Massachusetts Declaration of Rights, and also complain of violations of due process rights and the infliction of emotional distress.

The recorded statements reviewed by the Department, which the plaintiffs describe in ¶8 of the Complaint and which they contend formed the basis for the discipline they challenge, were converted to written transcripts, and defendants submit those transcripts for the Court's consideration on this motion. Because they form the very foundation of the plaintiffs' claims and because the statements are referred to several times throughout the Complaint, the Court may consider the transcripts on a motion under Fed. R. Civ. P. 12(c) without converting the motion to one for summary judgment under Rule 56.

Specifically, on a Rule 12 motion the Court may consider "documents the authenticity of which are [sic] not disputed by the parties; . . . official public records; . . . documents central to plaintiff's claim; or . . . documents sufficiently referred to in the complaint." Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)) (permitting consideration on Rule 12(b)(6) motion of settlement agreement that was neither appended to nor incorporated in plaintiffs' complaint); Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998). The transcripts qualify in at least the latter two categories, as documents central to plaintiffs' claim and sufficiently referred to in the Complaint.

## ARGUMENT

### A.    The MBTA Did Not Violate The Officers' Limited Rights To Free Speech.

A public employee who contends that his employer retaliated against him for exercising his First Amendment rights must satisfy a four-part test. See, e.g., Guilloty

- 3 -

<u>Perez</u> v. <u>Pierluisi</u>, 339 F.3d 43, 50-51 (1ˢᵗ Cir. 2003). First, the employee must demonstrate that his speech involves "matters of public concern." <u>Id</u>. at 51 (quoting <u>Connick</u> v. <u>Myers</u>, 461 U.S. 138, 147 (1983). If that burden is satisfied, then the Court must weigh the employee's interest in making the comment against the public employer's interest "in promoting efficient performance of the public service the government agency or entity must provide through its employees" – the so-called "<u>Pickering</u> balancing test" established by <u>Pickering</u> v. <u>Bd. of Educ.</u>, 391 U.S. 563 (1968). <u>Id</u>. at 51. If that balance favors the employee, the employee must next demonstrate "that the protected expression was a substantial or motivating factor in the adverse employment decision." <u>Id</u>. (citation omitted). Finally, if the employee satisfies these three requirements, the employer then has an opportunity to demonstrate that it would have taken the same action "even in the absence of the protected conduct." <u>Id</u>. (quoting <u>Mt. Healthy City Sch. Dist. Bd. of Educ.</u> v. <u>Doyle</u>, 429 U.S. 274, 287 (1977).

Although some of these elements may require consideration of facts beyond the Complaint, there is ample basis here to conclude that plaintiffs cannot establish their claim as a matter of law. Solely for purposes of this Rule 12(c) motion, we limit consideration to the statements that plaintiffs allege formed the basis for discipline. The Complaint alleges that the MBTA considered statements in four categories: (a) requests for Criminal Offender Record Information; (b) expressions of displeasure with senior officers of the Department; (c) references to the Chief as "No Show Joe"; and (d) discussions concerning the safety of the Dudley MBTA station. Complaint ¶8.

### 1.     Plaintiffs' Statements Did Not Involve Matters Of Public Concern.

Whether a statement satisfies the "matter of public concern" requirement is a question of law. <u>Connick</u>, 461 U.S. at 148 n.7; <u>see</u> <u>Guilloty Perez</u>, 339 F.3d at 51; <u>Meaney</u>

- 4 -

v. <u>Dever</u>, 326 F.3d 283, 288 (1st Cir. 2003). Where a statement does not involve a matter of public concern, as determined by the "content, form, and context" of the statements, "it is unnecessary for [a court] to scrutinize the reasons for . . . discharge." <u>Id</u>. The plaintiffs' statements cannot overcome this initial barrier, because they do not relate to any question of public concern.

a.    <u>CORI Requests</u>. First, plaintiffs contend (and, for that matter, the MBTA does not dispute) that they were disciplined for requesting criminal history information protected from disclosure by Massachusetts' Criminal Offender Record Information statute, Mass. Gen. L. c, 6, §§168-171. In particular, Jordan called MacKay on several occasions to request CORI information on individuals who had asked that favor of Jordan; MacKay had access to the Department computer that permits such searches.[2] On one such occasion, Jordan requested information on a contractor whom he believed had dealt unfairly with his sister; he told MacKay he wanted the individual's address, because "I might have someone go say hi." Tr. II:55; <u>see id</u>. II:53-60. On another occasion, while watching the television show "Fear Factor," MacKay searched for – and gave to the unidentified caller – the address and age of a female contestant from Medford, Massachusetts whom he considered attractive. II:128-130.

These requests for statutorily protected information did not involve matters of public concern. The public has no interest in the criminal history of the individuals plaintiffs researched; to the contrary, that information is made strictly confidential by statute. The information was of interest solely to the individuals on whose behalf plaintiff Jordan requested it and plaintiff MacKay obtained it – and, in the case of the female game show contestant that MacKay investigated, not of proper interest to

---

[2] Transcript of recorded conversations ("Tr.") I:12-14; I:26-29; II:53-60; II:128-30.

anyone. Indeed, these requests can hardly even be characterized as statements, let alone statements intended to contribute to public discourse or to comment on any issue in which the public has an interest.

      b.    <u>Disparaging senior officers</u>. Plaintiffs refer to conversations "[d]iscussing [their] displeasure with the Deputy Chief," Complaint ¶8(b), but the only substantive comments they made about Deputy Chief John Martino – that is, apart from several references to him as "fucking Martino" – were a few references to internal personnel disputes. Specifically, MacKay objected to Deputy Chief Martino's broad authority in the Department and the policies he had instituted concerning vacation usage and patrol plans.[3] Other statements of "displeasure" with Department "management" mainly related to the two specific topics addressed in the following section; the few that remain are similarly limited to complaints about internal Department issues or general vituperation.[4]

      None of these statements involves a matter of public concern. In <u>Connick</u>, the decision that established the "public concern" test, the plaintiff sent her office colleagues a questionnaire that asked their opinions of intraoffice transfers, the effects of a "rumor mill" on office morale, and the degree of confidence held in various managers. <u>See</u> 461 U.S. at 155-56. The Supreme Court held that the statements did not involve matters of

---

    [3] MacKay commented that "He [Chief Carter] shouldn't be letting these fucking – fucking Martino run this place," Tr. I:126; that "Martino wasn't making any friends out here when he said we ain't changing the fucking patrol plan," Tr. I:140; and told another officer that Martino had tightened the rules on vacation usage "[j]ust to fuck with you," Tr. I:128.

    [4] In the former category, for example, MacKay said, criticizing a statement by Chief Carter, "Team work and all this bull shit where the Chief is coming out with his fucking foolishness. Yeah, why don't you deal with these fucking assholes, you know." Tr. I:24. As an example in the latter category, MacKay said of his superior officers, "Buddy, these fucking people here, Billy, are so fucking stupid it is not even funny." Tr. II:32-33.

public concern, because the questionnaire did not inform the public of any wrongdoing, or assist in any evaluation of elected officials' performance; it "would convey no information at all other than the fact that a single employee is upset with the status quo." 461 U.S. at 148. "[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." Id. at 149.

The same reasoning applies here. These officers' unhappiness with the way their senior management interacts with them is not of significant public interest. The tangential relationship between employees' morale or their opinion of senior officers' management abilities and the efficient performance of public duties was not sufficient to protect Connick's speech, see 461 U.S. at 148, and it does not protect these officers' general gripes.

c.    Statements concerning alleged "absenteeism" and the Dudley MBTA Station. The latter two categories of statements which plaintiffs claim were the basis of discipline also fail the "public concern" test, if not for their inherent subject matter then because of the "form and context" in which they were made. In Connick, the Supreme Court made clear that the "public concern" determination requires analysis not merely of what was said, but of "the content, form, and context of a given statement, as revealed by the whole record." 461 U.S. at 147-48.

Accordingly, the Seventh Circuit held in Kokkinis v. Ivkovich, 185 F.3d 840, 844 (7th Cir. 1999) that "speaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern as that term is employed in Connick." Instead, "it is necessary to 'look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or

was the point to further some purely private interest?'" Id. (quoting Callaway v. Hafeman, 832 F.2d 414, 417 (7th Cir. 1987)).

Following the same rule in this Circuit, the First Circuit held in Mullin v. Town of Fairhaven, 284 F.3d 31 (1st Cir. 2002), that a court must "examine the extent to which plaintiffs intended their speech to contribute to any 'public discourse,' or if it simply reflected personal or internal [Department] concerns." Id. at 38 (citing O'Connor v. Steeves, 994 F.2d 905, 914 (1st Cir. 1993); see also Fabiano v. Hopkins, 352 F.3d 447, 454 (1st Cir. 2003); Metzger v. DeRosa, 367 F.3d 699, 702 (7th Cir. 2004); Hasty v. City of Gladstone, 247 F.3d 723, 726 (8th Cir. 2001) (no public concern where plaintiff "did not intend to make an official report," but rather made "offhand" remarks "as part of a casual conversation"); Nunez v. Davis, 169 F.3d 1222, 1227 (9th Cir. 1999).[5]

Considering the plaintiffs' statements in the overall context in which they were made – even those nominally on subjects in which the public might have some interest – none of them involved a matter of public concern because these plaintiffs, like those in Connick, Metzger, and Hasty, commented on these topics solely in the context of complaining about internal personnel matters.

For example, much of the discussion concerning a murder at the Dudley MBTA Station revolved around a Boston Globe newspaper article which attributed several statements to Chief Carter; plaintiff MacKay and others apparently understood the Chief to be blaming a stalemate in union negotiations for the delay in implementing safety

---

[5] The court in Metzger explained: "where considerations of motive and context indicate that an employee's speech raised a topic of general societal interest merely for personal reasons rather than a desire to air the merits of the issue, or for the sole purpose of bolster[ing] [her] own position in a private personnel dispute with [her] superiors, these factors militate against the conclusion that the employee's speech is entitled to First Amendment protection." Id. (quoting Campbell v. Towse, 99 F.3d 820, 827 (7th Cir. 1996)).

- 8 -

improvements at the station. Tr. II:15-20, 22-29, 32-48. As a result, MacKay opined, "we look fucking ridiculous," id. II:24; "that's why you can't take any pride in this fucking shit hole." II:18. MacKay was also frustrated that the union had not responded more forcefully to the article; "I'd say, Hey Joe, you know what I'd say, 'that was one missile, and we're going to answer with one, and then we are even.'" II:15; see id. II:29, II:34.

Those comments plainly were not intended to contribute to any public discourse; again MacKay expresses his frustration about purely internal matters, in this case the frayed relationship between MBTA police unions and Department management. As the transcripts make clear, MacKay's concern was not about the safety of the Dudley station per se, but about his perception that the Chief was publicly holding the unions responsible for the situation, a "missile" that he thought the union should "answer": "the Chief . . . [threw] us under the bus calling us – basically saying that the reason that that kid died at Dudley is because [his] plan isn't into effect." II:115.[6]

The several references to "No Show Joe"[7] similarly fail the "public concern" test because of their context. MacKay directed none of his name-calling to the press, or to the public, or up the chain of command in an effort to correct or even to complain about any dereliction of duty; his comments were strictly an outgrowth of his discontent with working conditions and his disrespect for the Chief as a leader of the Department. For example, the first of these comments, Tr. I:24, comes in the context of a complaint about

---

[6] As the transcripts also reveal, Chief Carter responded to the article by writing a letter to the editor demanding a retraction, the text of which MacKay read to another officer over the phone. Tr. II:26. MacKay characterized it as "fucking stupid shit" and "a lie." Id. The Chief also sent an internal memo expressing his unhappiness with the newspaper article, which MacKay also read, id. at II:39-40.

[7] See Tr. I:24, I:30, I:38, II:51, II:108.

how Chief Carter was dealing with jurisdictional disputes between the MBTA Police Department and the Boston Police Department, which MacKay apparently thought was detrimental to the standing of the MBTA police. See id. at I:18-24. Another was a conversation about how the Chief's alleged absenteeism affected his ability as a leader of the MBTA police officers. See Tr. I:30. These are precisely the sort of complaints about internal personnel matters that the public concern test excludes. Like the statements at issue in Kokkinis, "the point of the plaintiff's speech was simply to further his own goal of expressing his displeasure with the Chief's policies." 185 F.3d at 844. None of the statements that plaintiffs allege were the basis for discipline addressed matters of public concern, and defendants are entitled to judgment on the pleadings.

> **2.    Plaintiffs' Minimal Interest In Making The Statements Was Outweighed By The MBTA's Legitimate Interest In Maintaining Discipline And Morale In The Police Force.**

Even a statement that involves a matter of public concern does not form the basis of a First Amendment claim if it "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 482 U.S. 378, 388 (1987). As noted above, the Court must balance the employee's interest in commenting on matters of public concern against these important interests of the agency as employer.

Innumerable cases hold that when striking that balance in a police department, special deference must be accorded to the unusual needs of such a paramilitary organization, where "discipline and respect for the chain of command are critical to accomplishing the entity's mission of maintaining order and public safety." Williams v.

- 10 -

Seniff, 342 F.3d 774, 784 (7th Cir. 2003).[8]  See also Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000) (citing the "heightened need for order, loyalty, morale, and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers"); Kokkinis, 185 F.3d at 845 ("[d]eference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement"); O'Donnell v. Barry, 148 F.3d 1126, 1135 (D.C. Cir. 1998) ("because of the special degree of trust and discipline required in a police force there may be a stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees"); Campbell v. Towse, 99 F.3d 820, 829-30 (7th Cir. 1996) ("It surely cannot be doubted that individuals who work in the highest echelons of the command of a police department must be assured of the loyalty of their immediate subordinates, as these subordinates are entrusted with carrying out their orders"), cert. denied, 520 U.S. 1120 (1997).[9]

That deference expressly extends to departmental responses to police officers' negative comments about their superior officers.  See, e.g., Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1290 (11th Cir. 2000) (police department has a strong interest in

---

[8] See also id. (citing Dill v. City of Edmond, 155 F.3d 1193, 1203 (10th Cir. 1998) (government has a "heightened interest . . . in maintaining discipline and harmony among employees" of law enforcement agencies); Tyler v. City of Mountain Home, 72 F.3d 568, 570 (8th Cir. 1995) (paramilitary character and mission of police departments results in greater latitude in discipline and personnel matters than a normal government employer); Klunk v. County of St. Joseph, 170 F.3d 772, 776 (7th Cir. 1999) (a police officer's position imposes a duty of loyalty and confidence)).

[9] See generally Kelley v. Johnson, 425 U.S. 238, 246 (1976) (recognizing the need to accord police departments wide latitude in decisions that impact "discipline, esprit de corps, and uniformity"); Moore v. City of Wynnewood, 57 F.3d 924, 934 (10th Cir. 1995) (government's interest is "particularly acute in the context of law enforcement, where there is a heightened interest . . . in maintaining discipline and harmony among employees").

- 11 -

preventing its officers from making unfounded accusations against a superior officer because it "could be considered disruptive and potentially undermining to the mutual respect and confidence needed for fellow officers in a police department"); Busby v. City of Orlando, 931 F.2d 764, 774 (11th Cir. 1991) ("In quasi-military organizations such as law enforcement agencies, comments concerning co-workers' performance of their duties and superior officers' integrity can directly interfere with the confidentiality, esprit de corps and efficient operation of the police department.").

The statements at issue in this case are indistinguishable from those that other courts have held to fail the Pickering balancing test. For example, in Cochran v. City of Los Angeles, 222 F.3d 1195 (9th Cir. 2000), the plaintiffs complained about allegedly preferential treatment of minorities, going over their immediate supervisor's head to do so, and criticized a fellow officer who failed to follow a request that officers call in sick on a designated day to support the union in negotiations with the police department. Id. at 1197-98. The Ninth Circuit held that the department's "significant interest" in responding to the plaintiffs' statements outweighed the officers' interest in making them, because the statements "directly challenged [the immediate supervisor's] ability to make decisions free from personal bias or preferences, and undermined her authority." Id. at 1200. And in Kokkinis, the plaintiff's complaints in a television interview about the vindictiveness of the police chief failed the Pickering test because it "adversely affected harmony and loyalty among co-workers" and "at least potentially endangered their working relationships," and his "criticism of the Chief on television . . . constituted a challenge to the Chief's authority and management style." 185 F.3d at 846.

The same could of course be said about all of the allegedly protected statements in this case. There is no question that plaintiffs challenged their Chief's "authority and management style," and that of Deputy Chief Martino, and that the statements had at

- 12 -

least the potential to undermine loyalty and obedience of plaintiffs and their colleagues to senior officers.  As a matter of law, the Department was entitled to act on those concerns without waiting to see whether plaintiffs' statements actually disrupted the Department.  See, e.g., Connick, 461 U.S. at 152 (employer need not "allow events to unfold to the extent that disruption of the office and the destruction of working relationships is manifest before taking action"); Cochran, 222 F.3d at 1200-1201; Kokkinis, 185 F.3d at 845-46 (employer "is not required to wait until those working relationships actually disintegrate").

By contrast, the plaintiffs' interest in criticizing their superior officers – let alone requesting protected criminal history information for personal reasons – is negligible. Here, again, the plaintiffs' motives for making the statements is relevant; statements made from "self-interest," even on matters otherwise of public concern, are entitled to "little weight" in the Pickering balance.  O'Connor, 994 F.2d at 915 (quoting Versarge v. Township of Clinton, 984 F.2d 1359, 1366 (3rd Cir. 1993)); Mullin, 284 F.3d at 39; see also Guilloty Perez, 339 F.3d at 53 ("the greater the value of the speech to the public, the more the balance tilts towards permitting the employee to express himself").  For the reasons explained in the preceding section, plaintiffs' speech had little value to the public, because the statements were made primarily, if not exclusively, to complain about the internal relationship between superior officers and their subordinates.  Here, as in Mullin,

> the import of that [public] concern [is] diminished by plaintiffs' preoccupation with personal disagreements and internal disputes over the workings of the [Department]. . . . Plaintiffs are hard pressed to elevate the First Amendment stakes by invoking the interests of the community in a public discourse that they appear to have done so little to foster.

284 F.3d at 39-40.

- 13 -

Judgment on the pleadings is appropriate because the first two components of the applicable First Amendment test – the "public concern" requirement and the Pickering balancing test – are questions of law. Guilloty Perez, 339 F.3d at 51. The Court has complete transcripts that include all of the statements potentially at issue and the surrounding context; discovery would not add significantly to the Court's evaluation of these threshold legal questions. The transcripts demonstrate that the plaintiffs made no statements on matters of public concern, and that in any event the Department's substantial interest in maintaining discipline and loyalty far outweigh whatever minimal personal interest the plaintiffs may have had in carping about their leadership and work situation. Defendants are entitled to judgment.

**B.    Chief Carter Is Immune From Suit In His Individual Capacity.**

A government employee such as Chief Carter is immune from damages for alleged free speech violations "where a reasonable official could believe (the test is objective), [even] mistakenly, that his conduct did not violate the First Amendment." Dirrane v. Brookline Police Dept., 315 F.3d 65, 69 (1st Cir. 2002) (citing Harlow v. Fitzgerald, 457 U.S. 800, 817-19 (1982)). This qualified immunity analysis requires a plaintiff pursuing a defendant in his individual capacity to prove both that the defendant violated a constitutional right, and further that the right in question was "clearly established" under the circumstances.[10] The latter test requires judgment for the defendant unless the plaintiff can prove that the defendant violated such a well-

---

[10] See, e.g., Fabiano, 352 F.3d at 453; Wilson v. Layne, 526 U.S. 603, 609 (1999) (courts "'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'") (quoting Conn v. Gabbert, 526 U.S. 286, 290 (1999)).

6880/49623-001  BNLIB1/5530v1

established prohibition that "a reasonable officer **must** have known that he was acting unconstitutionally." Id. at 71.[11]

Plaintiffs cannot satisfy either prong of the test, as a matter of law.  First, as shown in Part A, above, plaintiffs fail to allege violation of any constitutional right, clearly established or otherwise.

Second, even if plaintiffs stated a claim, which they do not, they cannot show that the constitutional right on which their claim rests was "clearly established" within the meaning of the qualified immunity doctrine.  "For the law to be clearly established, the law 'must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." Stanley, 219 F.3d at 1285 (quoting Lassiter v. Alabama A&M Univ. Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)).  "In other words, a police chief can guess wrong about the constitutionality of his conduct, provided the mistake is a reasonable one." Id. at 1294.

As the First Circuit has held, that burden is "especially difficult" in a First Amendment case, Fabiano, 352 F.3d at 457, because the uncertainty inherent in the Pickering balancing test makes it challenging to demonstrate that a reasonable public officer "**must** have known" he was acting unconstitutionally.[12]  As the Ninth Circuit

---

[11] The Court may consider this issue on a motion for judgment on the pleadings.  See, e.g., Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."); see also Saucier v. Katz, 533 U.S. 194, 200 (2001) ("Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.").

[12] "'Because Pickering's constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered "clearly established"' for purposes of qualified immunity. O'Connor, 994 F.2d at 917 n.11 (quoting Bartlett v. Fisher, 972 F.2d 911, 916-17 (8th Cir. 1992) (internal

similarly explained, qualified immunity in First Amendment cases "'depends upon the sensitive ad hoc balancing that <u>Pickering</u> entails,'" and accordingly the plaintiff's ultimate burden will be to prove that "'the outcome of the <u>Pickering</u> balance so clearly favored . . . [plaintiff] that it would have been patently unreasonable for the . . . officials to conclude that the First Amendment did not protect [her] speech.'" <u>Brewster</u> v. <u>Bd. of Educ.</u>, 149 F.3d 971, 980 (9th Cir. 1998).[13]

Plaintiffs' Complaint makes clear that, as a matter of law, they cannot meet the heavy burden of showing "the sort of unusual circumstances that would support the finding of a clearly established right notwithstanding <u>Pickering</u>." <u>Fabiano</u>, 352 F.3d at 457-58. Even if the Court should conclude that the statements at issue here were of sufficient public concern to invoke First Amendment protection, and that they carry enough weight in the <u>Pickering</u> balance to raise an issue, there is no credible argument here that the plaintiffs' statements were so ***obviously*** protected, and the Chief's interest in maintaining discipline and respect for senior officers so ***obviously*** outweighed by the plaintiffs' interest in complaining among themselves, that a reasonable official in the Chief's position would have known it was unconstitutional to impose discipline, and that any other outcome was "patently unreasonable."

---

quotation marks omitted)); <u>see also</u> <u>Frazier</u> v. <u>Bailey</u>, 957 F.2d 920, 931 (1st Cir. 1992) ('if the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered "clearly established," at least in the absence of closely corresponding factual or legal precedent'"). <u>Fabiano</u>, 352 F.3d at 457.

[13] <u>See also</u> <u>DiMeglio</u> v. <u>Haines</u>, 45 F.3d 790, 806 (4th Cir. 1995) ("the outcome of the balancing test can "only infrequently" be said to be "clearly established"); <u>Hansen</u> v. <u>Soldenwagner</u>, 19 F.3d 573, 576 (11th Cir. 1994) ("Because <u>Pickering</u> requires a balancing of competing interests on a case-by-case basis . . . only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated 'clearly established' federal rights.").

- 16 -

The purpose of the qualified immunity doctrine is "to give government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery . . . , as [i]nquiries of this kind can be peculiarly disruptive of effective government.  Whether or not a later summary judgment motion is granted, denial of a motion to dismiss is conclusive as to this right."  Behrens v. Pelletier, 516 U.S. 299, 308 (1996) (quoting Mitchell, 472 U.S. at 526) (citations, emphasis, and internal quotations omitted).  So important is the right of immunity from suit, in fact, that an immediate interlocutory appeal is permitted upon denial of a motion raising the defense.  See id.  That protection is especially applicable here, where the plaintiffs fail to state a claim of even a colorable violation of their constitutional rights.  Chief Carter is immune from suit in his individual capacity.

## C.    The Police Association Has No Standing To Sue.

An association may sue either by alleging an injury to itself or by demonstrating that it has standing to vindicate the rights of its membership.  See, e.g., Warth v. Seldin, 422 U.S. 490 (1975).  The MBTA Police Association (the "Union") satisfies neither of these tests.

First, the Complaint does not allege any injury to the Union's organizational interests.  The Complaint instead refers consistently to the individual plaintiffs and to "others represented by the plaintiff Union."  Complaint ¶¶5, 6, 17, 19.[14]  An organization

---

[14] Counts III-VII allege causes of action on behalf of "the plaintiffs" collectively.  But Counts III-VI complain only about "discipline" on various grounds, and there is no allegation that the defendants disciplined the Union in any way.  Count VII asserts a claim for emotional distress on behalf of all plaintiffs, but an organization cannot assert such a claim.  See, e.g., Mikolinski v. Burt Reynolds Production Co., 10 Mass. App. Ct. 895 (1980) ("It also seems obvious that a corporation cannot lay claim for emotional distress; [any such claim must allege conduct] directed at some specific individual or individuals and not merely at an indeterminate class.").

seeking standing on its own behalf bears a heightened burden to plead "reasonably definite factual allegations … regarding each material element needed to sustain standing." <u>Risinger</u> v. <u>Concannon</u>, 117 F. Supp. 2d 61 (D. Me. 2000) (quoting <u>U.S.</u> v. <u>AVX</u> <u>Corp.</u>, 962 F.2d 108, 115 (1st Cir. 1992)).  On the face of the Complaint, then, the Union has standing, if at all, only as a representative of its members.

But the doctrine of associational standing permits suits on behalf of individual members only where three criteria are met: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  <u>Hunt</u> v. <u>Washington State</u> <u>Apple</u> <u>Advertising</u> <u>Comm'n</u>, 432 U.S. 333, 343 (1977).  Here, even assuming that the first two criteria are satisfied, the Union's claim of standing founders on the third prong of the test.

"We know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members."  <u>Bano</u> v. <u>Union</u> <u>Carbide</u> <u>Corp.</u>, 361 F.3d 696, 714 (2nd Cir. 2004).  Indeed, even if the Union sought only declaratory or injunctive relief, it would not have standing if "the fact and extent" of the injury that gives rise to the claims for such equitable relief "would require individualized proof."  <u>Warth</u>, 422 U.S. at 515-16; <u>see</u> <u>Bano</u>, 361 F.3d at 714.

Individual proof is essential here regardless of the form of relief sought.  The Complaint alleges that individual officers were disciplined on the basis of recorded telephone conversations, and that while the MBTA admittedly has the right to review such tapes "to maintain the efficiency, safety, and sound maintenance record keeping," Complaint ¶10, and perhaps "for investigative purposes or when requested by the MBTA Legal Department or court order," <u>id</u>. ¶12, those requirements, the plaintiffs say, were

- 18 -

not satisfied with respect to the tapes used here. Plaintiffs also claim that individuals were disciplined because of particular comments on the tapes, id. ¶13, and that the individuals suffered both monetary and emotional injury from the actions taken against them, id. ¶15.

Here, as in Bano, "[n]ecessarily, each of those individuals would have to be involved in the proof of his or her claims." 361 F.3d at 714-15. Each officer's case must be considered individually, both as to liability and damages. As to liability, individual proof will be necessary to assess the content, form, and context of the particular comments that plaintiffs contend led to discipline. Connick, 461 U.S. at 147-48. The Pickering balance between the MBTA's interests and the officer's interests must be struck for each individual on the basis of particular comments made. And if a constitutional violation were found, the extent of the police officer's damages would also require an individual assessment. In similar circumstances, the Second Circuit held that "we see no sound reason to allow the organization to press their claims, even where it seeks to do so as a putative class representative." 361 F.3d at 715; see also Reid v. Dept. of Commerce, 793 F.2d 277, 279-80 (Fed. Cir. 1986) (union lacked standing to seek back pay for its members). The Union has no standing here, and its claims should be dismissed.

### D. Plaintiffs Have Failed To State A Claim For Intentional Infliction of Emotional Distress.

Count VII of the Complaint asserts a claim for infliction of "extreme emotional distress." Complaint ¶¶29, 30. The claim against the MBTA Police Department and against Chief Carter in his official capacity fail as a matter of law, because such alleged injuries are barred by the exclusivity provision of the Massachusetts workers compensation statute. See Green v. Wyman-Gordon Co., 422 Mass. 551, 557-59 (1996);

- 19 -

Doe v. Purity Supreme, Inc., 422 Mass. 563, 566 (1996); Anzalone v. Mass. Bay Transit Auth., 403 Mass. 119 (1988).

To the extent plaintiffs assert their emotional distress claim against Chief Carter individually, the workers compensation bar similarly applies unless the Chief's conduct "was in no way within the scope of employment furthering the interests of the employer." O'Connell v. Chasdi, 400 Mass. 686, 690 (1987). There is no basis for such an argument in this Complaint; the distressing conduct that plaintiffs allege includes only an investigation of statements they made on official MBTA telephone lines, and disciplinary action taken against them because of those statements.

Whether or not that discipline was appropriate or even lawful – though in fact it was both, see supra Part A – there can be no question that the actions Chief Carter allegedly took against the plaintiffs were undertaken entirely within the scope of his employment as Chief of the MBTA Police Department. See, e.g., Anzalone, 403 Mass. at 122-23, 125 (various allegations of employee mistreatment, including forcing the employee to work near smokers and painters, to perform dirty and menial jobs, and to work in overheated room, all "arose in the course of employment by the MBTA"); see also Fusaro v. Blakely, 40 Mass. App. Ct. 120 (1996) (overzealous interrogation of school employee by campus police was in furtherance of employer's interest).

Even if plaintiffs' claims were not barred by these threshold requirements, the Complaint still fails to state a claim because it does not identify any conduct that was "extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community," nor allege that the distress plaintiffs contend they have suffered was "of such a nature that no reasonable person could be expected to endure it." Conley v. Romeri, 60 Mass. App. Ct. 799, 803 (2004) (quoting Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997)).

- 20 -

The conduct plaintiffs allege was "extreme and outrageous" was, apparently, the Department's decision to listen to their recorded statements and the decision to put the individual plaintiffs on paid administrative leave pending investigation. But the officers plainly knew that their statements were being recorded and might be heard by others; in the transcripts they repeatedly defer certain topics of conversation to another time, or to another telephone line, because their conversation was being recorded. See Tr. II:67, II:73, II:76, II:115, II:142. And as a matter of law the mere imposition of paid leave does not rise to the level of "utterly intolerable" conduct that is "beyond all possible bounds of decency."[15] Plaintiffs fail to state a claim against any defendant for infliction of emotional distress, even if their claims were not otherwise barred by law.

### E.    Defendants Did Not Violate The Plaintiffs' Rights To Due Process Of Law.

Plaintiffs' due process rights are expressly protected by statute, and they have no basis for complaint. Though they acknowledge that they were given a full hearing – where they were represented by counsel, argued their case, and were permitted to testify, to cross-examine witnesses, and to offer exhibits and other evidence – they apparently contend that the hearing officer should have been a neutral third party, rather than one appointed by the MBTA.[16] The claim fails as a matter of law.

---

[15] Courts have regularly rejected emotional distress claims that presented far more "outrageous" conduct than is alleged here. Cf. Foley v. Polaroid, Inc., 400 Mass. 82 (1987) (no claim where plaintiff was suspended after indictment for rape in workplace, and after acquittal was transferred, taunted, given little of substance to do, and otherwise humiliated); Bernard v. Cameron & Colby Co., 397 Mass. 320 (1986) (no claim where employee with known allergy to tobacco was forced to work with two smokers); Richey v. American Automobile Assn., 380 Mass. 835 (1980) (no claim where plaintiff was terminated for absences arising out of health problems and the death of a parent).

[16] The Complaint does not make any allegation at all concerning the process that was given; Count I simply asserts a violation of due process without any factual allegations to support it. Indeed, the Complaint is so deficient in this regard as to fail even to meet the

- 21 -

As an initial matter, Massachusetts' civil service law, Mass. Gen. L. c. 31, §§41-44, requires that an initial hearing be held only "before the appointing authority or a hearing officer designated by the appointing authority." Mass. Gen. L. c. 31, §41. There is no requirement that an initial hearing be held before a neutral. See, e.g., McIsaac v. Civil Service Comm'n, 38 Mass. App. Ct. 473, 476 (1995) ("There is no nonstatutory right to a hearing, in the first instance, before a disinterested hearing officer.").

In any case, plaintiffs have a complete remedy as a matter of statute. Whether they contend that they were denied a hearing that satisfied statutory requirements, or merely disagree with the outcome of that hearing, they may take their case to the Massachusetts Civil Service Commission, which will hold its own hearing "before a member of the commission or some disinterested person designated by the chairman." See Mass. Gen. L. c. 31, §§42 (complaint that no hearing was held), 43 (appeal from initial hearing). And if dissatisfied again, they may pursue the matter in Superior Court. Mass. Gen. L. c. 31, §44.

These procedures amply satisfy the requirements of due process, as the First Circuit squarely held in Cronin v. Town of Amesbury, 81 F.3d 257, 260 (1st Cir. 1996). Rejecting a former police chief's due process claim after he was terminated, the court held that the "extensive postdeprivation remedies in the form of the Civil Service Law" fully satisfied due process requirements. More specifically, the First Circuit held that no procedural due process claim can succeed, even if proceedings before termination are inadequate, if the state provides an adequate post-deprivation remedy. See id. (citing

---

minimal standards of Fed. R. Civ. P. 8. See, e.g., Risinger, 117 F. Supp. 2d at 68 ("tolerance" of facts as pleaded and reasonable inferences therefrom "does not extend to legal conclusions or to bald assertions") (citations omitted). Assuming the Court nevertheless is inclined to consider the due process claim, defendants rely on the oral characterization of the claim offered by plaintiff's counsel at the September 1, 2004 scheduling conference.

Lowe v. Scott, 959 F.2d 323, 340-41 (1st Cir. 1992) ("[I]f a state provides adequate postdeprivation remedies – either by statute or through the common-law tort remedies available in its courts – no claim of a violation of procedural due process can be brought under §1983 against the state officials whose random and unauthorized conduct caused the deprivation.")); Locurto v. Safir, 264 F.3d 154, 173 (2nd Cir. 2001) ("Although due process guarantees notice and a hearing prior to the termination of a tenured public employee, the requisite hearing is a minimal one.").

As the Supreme Court explained in Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 545-46 (1985), the only purpose of a pretermination hearing is to act as "an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." No neutral judge is required at this limited hearing; with the assurance of full review after the decision is made, due process requirements are fully satisfied. See also Locurto, 264 F.3d at 174 ("No subsequent decisions [since Loudermill] from our Circuit or other circuits have held that such a neutral adjudicator is a necessary component of due process at a pre-termination hearing. We hold that it is not.") (citing Cronin and decisions from seven other circuits). The Complaint fails to state a claim for violation of plaintiffs' due process rights.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for judgment on the pleadings should be granted.

- 23 -

Respectfully submitted,

MBTA POLICE DEPARTMENT
CHIEF JOSEPH C. CARTER

By their attorneys,


/s/ Mark W. Batten
Mark W. Batten
PROSKAUER ROSE LLP
One International Place, 14th Floor
Boston, MA 02110
(617) 526-9850

Dated: November 3, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record, either through the electronic filing process or by first-class mail, postage prepaid, this 3rd day of November, 2004.


/s/Mark W. Batten
Mark W. Batten

- 24 -