UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONALD JORDAN, ROBERT McKAY, and THE MBTA POLICE PATROLMAN'S UNION, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>JOSEPH C. CARTER, individually and as Chief of the MBTA Police Department, and THE MBTA POLICE DEPARTMENT, )<br><br>Defendants. ) | Civil Action No. 04-10927-RGS |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This Court granted much of the defendants' motion for judgment on the pleadings, rejecting most of the claims asserted by MBTA police officers Ronald Jordan and Robert MacKay against their employer, the MBTA Police Department (the "Department") and Chief of Police Joseph C. Carter ("Chief Carter"). With respect to the plaintiffs' core claim that they were disciplined in violation of their constitutional free speech rights, however, the Court held that the plaintiffs' allegedly protected statements were not properly before the Court on such a preliminary motion, and accordingly denied the motion in that single respect.

With discovery now complete, and the statements and their surrounding context now available for the Court's consideration, the record is clear that the

plaintiffs cannot prevail.  As a matter of law, the statements for which Jordan and MacKay were disciplined involved no matters of public concern.   The plaintiffs retrieved confidential, statutorily protected information on a number of individuals with no law enforcement purpose, including a female TV game show contestant whom MacKay thought was attractive; they expressed profane, angry disrespect for senior officers and their own colleagues; and they aired routine gripes about relations between their union and management.  The First Amendment does not protect such speech.

Plaintiffs' claims also fail because they cannot demonstrate an interest in saying such things that outweighs the Department's legitimate interests in maintaining efficiency, performance, and discipline, interests that circuit decisions from across the country uniformly hold to be of special significance when the employer is a police department.  The plaintiffs were not exposing corruption, commenting on public affairs, or expressing political views; they were complaining about the conditions of their employment and expressing discontent with new management.

Finally, Chief Carter is entitled to judgment on plaintiffs' claims against him individually, because they cannot begin to overcome the steep hurdle posed by the doctrine of qualified immunity.  That doctrine requires the plaintiffs to prove that the law was so clearly established in their favor that no reasonable person in Chief Carter's position, faced with the facts as described, could have believed that discipline was constitutional.  To the contrary, here, it was clearly established that discipline in these circumstances was lawful. Chief Carter is immune from suit, and as a matter of law the plaintiffs cannot prevail on their claims against either defendant.

## STATEMENT OF FACTS[1]

Joseph Carter was appointed Chief of the MBTA Police Department effective January, 2003.  Deposition of Chief Joseph Carter ("Carter Dep.") at 4. Before his appointment, there were concerns in the community, expressed in the findings of a community task force, that the MBTA Police Department was engaged in racial profiling, and had taken excessive enforcement action against young people riding the MBTA.  Id. at 88.  Jordan and MacKay believe that Chief Carter, who is African-American, was appointed in part because of his race, "to try to appease the Roxbury public."  Deposition of Ronald Jordan ("Jordan Dep.") at 33; see Deposition of Robert MacKay ("MacKay Dep.") at 36-37.  Shortly after his appointment, Chief Carter created a process to involve members of the Department, community leaders, and youth in discussion "about all aspects of the department administration" and to develop a plan of action "for a new manner in which to police the MBTA."  Id. at 89.

About a year after Chief Carter's appointment, in February, 2004, Lieutenant Detective Mark Gillespie was listening to tapes of recorded telephone conversations involving MBTA police officers.  Deposition of Mark Gillespie ("Gillespie Dep.") at 17.  He was doing so because two officers under his command had been involved in an altercation with a state trooper on February 10, 2004, and he thought there might be conversations relevant in determining what had happened.  Id. at 8-13, 17-19.  Apparently because he was unfamiliar with the software for reviewing the tapes, however, Gillespie instead listened to conversations taped on February 18, 2004.  Id. at 17-19.

---

[1] As required by Local Rule 56.1, defendants submit a complete statement of material facts separately, and summarize those facts here for the Court's convenience.

He overheard conversations involving plaintiff Robert MacKay which he believed were in violation of Department rules and regulations.  <u>Id</u>. at 21-22. At the time, MacKay was assigned to the Monitor Room, where, among other duties, he was responsible to answer emergency telephone lines, and had authority to conduct computerized queries for information on individuals' outstanding warrants, probation records, and Registry of Motor Vehicles information.  MacKay Dep. at 12-13, 16-18.  Among the telephone lines that MacKay was responsible to answer was the "1205 line" (617-222-1205), on which he frequently spoke to other MBTA police officers calling in from the field.

Gillespie orally reported the conversations he had overheard to Deputy Chief Thomas McCarthy.  <u>Id</u>. at 22-23; Deposition of Thomas McCarthy ("McCarthy Dep.") at 13.[2]  McCarthy consulted with Chief Carter, who authorized an investigation of the taped conversations, and after consulting with the MBTA's General Counsel, McCarthy himself began listening to conversations recorded during MacKay's shift over a period of several months. McCarthy Dep. at 20-22.  As they relate to the plaintiffs in this case, McCarthy summarized the results of his investigation in two memoranda to Chief Carter dated March 8, 2004.[3]

---

[2] Gillespie testified that he listened to the conversations himself; McCarthy testified that Gillespie told him that the two detectives involved in the altercation had done the listening.  McCarthy Dep. at 15.  The difference is not material and defendants do not insist on one version of these facts over another.

[3] <u>See</u> Defendants' Statement Of Undisputed Facts In Support Of Motion For Summary Judgment ("Fact Statement") at Tabs F, G.  Two volumes of the transcripts of the conversations in question (cited here as "Tr. I" and "Tr. II") are attached to the Fact Statement at Tabs H and I.

/- Current/8857238v1

By letters dated April 13 and 14, 2004 to Jordan and MacKay, respectively, the Department notified the plaintiffs of disciplinary hearings involving their recorded conversations. <u>See</u> Fact Statement at Tabs J, K. With respect to Jordan, the alleged violations primarily concerned his calling MacKay and obtaining Criminal Offender Records Information ("CORI"), which is protected by statute but to which MacKay had authorized access, on three individuals. <u>See</u> Fact Statement Tab J; Mass. Gen. L. c. 6, §278.

Specifically, while in an inpatient drug rehabilitation clinic (and, therefore, not on duty), Jordan had called MacKay and obtained outstanding warrant information at the request of two of his fellow inpatients at the clinic. Jordan Dep. at 71-72, 74-75; Tr. I:12-14, 26-29. On another occasion, Jordan called MacKay for Registry information and Board of Probation records concerning a Kevin Mitchell, whom Jordan says had taken $2,500 from his sister for certain work and then "never showed up." Jordan Dep. at 75-76; Tr. II:53. In the conversation Jordan told MacKay that he was "trying to figure out what he's got for an address, I might have someone go say hi." Tr. II:55; Jordan Dep. at 77. "The Squid might come by," Jordan said.[4] MacKay warned Jordan that "we['re] going to hear it from this one when they call back." ". . . Well, you can just tell them. They can call me if they give you any shit," Jordan responded. Tr. II:58-59. In addition to these alleged CORI violations, Jordan was charged with insubordination for a conversation in January 2004,

---

[4] Jordan now says that he was joking about the reference to the "Squid," "a strange looking kid" who was a mutual acquaintance of Jordan and MacKay. Jordan Dep. at 78-79. He testified that his reference to having "someone go say hi" was a reference to a "very good friend" who is a Chelsea police officer. <u>Id</u>. at 77.

when he responded to a Sergeant Douglas by saying "I got a nice big stiff cock for you." Tr. I:98.[5]

MacKay was charged with a much longer list of violations, in several categories. Fact Statement at Tab K. First, he was charged with violation of CORI, not only for the several checks he ran at Jordan's request, but also for two others. First, at the request of a civilian apparently unknown to MacKay but who had obtained the 1205 phone number from another officer, MacKay ran a license plate number and provided information about the vehicle's owner and her address. Tr. II:97-100. The caller gave no reason for the request, and MacKay did not ask. See id.

Second, later that same day, MacKay was speaking with a friend while both were watching a television game show called "Fear Factor." Tr. II:127-30 ff. One of the contestants, a female, was described as from Massachusetts, and MacKay said "She looks fucking nice." Id. at 128. "What does she look around 20?" the caller asked; "Hold on, just punching something in here," MacKay replied. "Yeah, right there, buddy, [birthdate]." Id. at 129. MacKay then gave a street in Medford, the address of the woman. "Oh, I know where that is," said the caller. "That must be an apartment, huh?" Id. "I guess," MacKay replied, and gave the birthdate again. The caller repeated the address. "Dirty bitch," the caller said. Id. MacKay later testified that he obtained the woman's address and birthdate out of "curiosity," and acknowledged that the information was not available to the general public. MacKay Dep. at 110.

---

[5] Jordan again contends that he was joking, that Sergeant Douglas, though a senior officer, was also a friend and former partner. Jordan Dep. 65.

- 6 -

In addition to the charges concerning confidential information, MacKay was charged with making a variety of disrespectful statements about senior commanders in violation of Department regulations. See Fact Statement Tab K at 2. Most of these statements arose from conversations in the wake of a stabbing murder at the Dudley station of the MBTA. MacKay Dep. at 42. MacKay was upset both because Chief Carter had not appeared at the murder scene, and because in a Boston Globe article about the stabbing Chief Carter made comments suggesting, to MacKay, that the crime might have been prevented if the Chief's new patrol plan had been in effect, but that the plan had been held up by negotiations with the patrolmen's union. Id. at 42-43, 77-78. In a variety of ensuing conversations, MacKay told other officers that Chief Carter was a "fucking liar"; that his policies amounted to "fucking foolishness"; that the command officers "don't give a fuck" and "are so fucking stupid it is not even funny"; and that as a result "you can't take any pride in this fucking shit hole." Fact Statement Tab K at 2-3; see Tr. II:15-20, 22-29, 32-48. MacKay interpreted the Chief's comments as aimed at the union, "a nice missile you just sent right across our bow," and that the union should "answer with one, and then we're even." Tr. II:15, 34.

Of the three dozen charges against MacKay, one alleged disrespect for calling Chief Carter "No Show Joe" in a December 2003 conversation. Fact Statement Tab K at 2; Tr. I:38. The transcript shows that the reference occurred toward the end of a conversation complaining about fellow officers and the hardships of outdoor assignments during the winter. See Tr. I:32-38.

MacKay also was charged with violations for a number of remarks about Deputy Chief Martino, which seem to have been grounded in complaints that

- 7 -

Chief Carter had given Martino too much discretion and that he was using that authority to make unfavorable changes in vacation scheduling and similar matters.  See, e.g., Tr. I:126-28, 140.

MacKay was also charged with violations of Department regulations for apparently discriminatory comments, including a discussion of a talk radio host's comments about gay marriage, in which MacKay repeated the host's comment that "I hope they all drop dead"; a comment about a warrant check on a black male; and similar remarks.  Fact Statement Tab K at 3-5; Tr. I:18, 100, II:63.

Finally, MacKay was charged with violations for comments about fellow officers, including such sobriquets as "retard," "fucking idiot," "fucking kid," and so on.  See Fact Statement Tab K at 2-3; Tr. I:34, 35, II:178-79.  In another conversation MacKay objected to officers attending a promotional ceremony as sycophants; in MacKay's more colorful version, the officers were "brown spots" engaged in "semen swapping."  Tr. I:17-18.

After an adversary hearing, a hearing officer of the MBTA found just cause to support the alleged violations of the CORI statute and Department rules and regulations, and recommended that Jordan and MacKay be terminated.   Carter Dep. at 73; see Fact Statement Tab L.  Chief Carter thereafter adopted that recommendation and terminated Jordan's and MacKay's employment.  Id.  Arbitrators addressing grievances filed by Jordan and MacKay under the applicable collective bargaining agreement subsequently reduced that discipline to a one-day and five-day suspension for Jordan and MacKay, respectively.

Though Jordan and MacKay both consider themselves "outspoken" (MacKay Dep. at 97; Jordan Dep. at 24), MacKay has never made complaints to the public or to the command staff apart from union negotiations, MacKay Dep. at 32-33, 46, and while Jordan testified that he has complained about "manning," "safety," "contract negotiations, pension, typical union issues," Jordan Dep. at 23, he has never had a negative response from senior officers about his tendency to speak his mind.[6]

## ARGUMENT

### A.    The MBTA Did Not Violate The Officers' Limited Rights To Free Speech.

A public employee who contends that his employer retaliated against him for exercising his First Amendment rights must satisfy a four-part test.  See, e.g., Guilloty Perez v. Pierluisi, 339 F.3d 43, 50-51 (1st Cir. 2003).  First, the employee must demonstrate that his speech involves "matters of public concern."  Id. at 51 (quoting Connick v. Myers, 461 U.S. 138, 147 (1983)).  If that burden is satisfied, then the Court must weigh the employee's interest in making the comment against the public employer's interest "in promoting efficient performance of the public service the government agency or entity must provide through its employees" – the so-called "Pickering balancing test" established by Pickering v. Bd. of Educ., 391 U.S. 563 (1968).  Id. at 51.  If that balance favors the employee, the employee must next demonstrate "that

---

[6] "A. . . . Like I said, I'm the type of person, I'm not afraid to speak my own mind about that and, you know.  Q. And I gather the command staff doesn't object to that?  They don't – A. Not really, no."  Jordan Dep. at 25.  His complaint about "manning" was that he believed too many officers were assigned where they were not needed and too few where they were needed.  Id. at 24.  His complaint about "safety" was actually an objection to Chief Carter's alleged statements in the Globe concerning the revised patrol plan.  Id. at 25-26.

the protected expression was a substantial or motivating factor in the adverse employment decision." <u>Id</u>. (citation omitted).  Finally, if the employee satisfies these three requirements, the employer then has an opportunity to demonstrate that it would have taken the same action "even in the absence of the protected conduct." <u>Id</u>. (quoting <u>Mt. Healthy City Sch. Dist. Bd. of Educ.</u> v. <u>Doyle</u>, 429 U.S. 274, 287 (1977).  There is no genuine issue of fact as to at least the first two of these four requirements, and defendants are entitled to judgment.

### 1.    Plaintiffs' Statements Did Not Involve Matters Of Public Concern.

Whether a statement satisfies the "matter of public concern" requirement is a question of law.  <u>Connick</u>, 461 U.S. at 148 n.7; <u>see Guilloty Perez</u>, 339 F.3d at 51; <u>Meaney</u> v. <u>Dever</u>, 326 F.3d 283, 288 (1st Cir. 2003).  Where a statement does not involve a matter of public concern, as determined by the "content, form, and context" of the statements, "it is unnecessary for [a court] to scrutinize the reasons for . . . discharge." <u>Id</u>.  The statements that formed the basis for discipline cannot overcome this initial barrier, because they do not relate to any question of public concern.

a.    <u>CORI Requests</u>.  First, plaintiffs contend (and, for that matter, the MBTA does not dispute) that they were disciplined for requesting criminal history information protected from disclosure by Massachusetts' Criminal Offender Record Information statute, Mass. Gen. L. c, 6, §§168-171.  In particular, Jordan called MacKay on several occasions to request CORI information on individuals who had asked that favor of Jordan.[7]  MacKay had

---

[7] Tr. I:12-14; I:26-29; II:53-60; II:128-30.

access to the Department computer that permits such searches, a password-protected computer to which access is granted only after special training and testing.  MacKay Dep. at 24-25.

Several of these requests were made when Jordan was not on duty as a police officer, but was calling MacKay from an inpatient drug rehabilitation clinic, checking on the warrant status of other patients at their request.  On another occasion, Jordan requested MacKay to provide information about a contractor whom Jordan believed had dealt unfairly with his sister; he told MacKay he wanted the individual's address, because "I might have someone go say hi."  Tr. II:55; see id. II:53-60.  Perhaps most egregiously, on another occasion MacKay was talking with an unidentified "friend" while watching the television show "Fear Factor."  MacKay Dep. 109-110.  MacKay searched for – and gave to his friend – the address and age of a female contestant from Medford, Massachusetts whom they considered attractive.  Id.; see Tr. II:128-130.

None of these requests for statutorily protected information involved matters of public concern.  The public has no interest in the criminal history of the individuals plaintiffs researched; to the contrary, that information is made strictly confidential by statute.  The information was of interest solely to the individuals on whose behalf plaintiff Jordan requested it and plaintiff MacKay obtained it.  In the case of the female game show contestant that MacKay investigated, the information was not of proper interest to anyone.  Indeed, these requests can hardly even be characterized as statements, let alone statements intended to contribute to public discourse or to comment on any issue in which the public has an interest.

- 11 -

b.  <u>Disparaging senior officers and colleagues</u>.  Plaintiffs refer to conversations "[d]iscussing [their] displeasure with the Deputy Chief," Complaint ¶8(b), but the only substantive comments they made about Deputy Chief John Martino – that is, apart from several references to him as "fucking Martino" – were a few references to internal personnel disputes.  Specifically, MacKay objected to Deputy Chief Martino's broad authority in the Department and the policies he had instituted concerning vacation usage and patrol plans.[8] Other statements of "displeasure" with Department "management" mainly related to the two specific topics addressed in the following section; the few that remain are similarly limited to complaints about internal Department issues or general vituperation.[9]  MacKay also took aim at fellow officers, two of whom he labeled a "fucking idiot" and a "fucking kid," and others of whom he criticized for currying favor with the command staff.[10]

None of these statements involves a matter of public concern.  In <u>Connick</u>, the decision that established the "public concern" test, the plaintiff sent her office colleagues a questionnaire that asked their opinions of

---

[8] As examples, MacKay commented that "He [Chief Carter] shouldn't be letting these fucking – fucking Martino run this place," Tr. I:126; that "Martino wasn't making any friends out here when he said we ain't changing the fucking patrol plan," Tr. I:140; and told another officer that Martino had tightened the rules on vacation usage "[j]ust to fuck with you," Tr. I:128.

[9] In the former category, for example, MacKay said, criticizing a statement by Chief Carter, "Team work and all this bull shit where the Chief is coming out with his fucking foolishness.  Yeah, why don't you deal with these fucking assholes, you know." Tr. I:24.  In the latter category, MacKay said of his superior officers, "Buddy, these fucking people here, Billy, are so fucking stupid it is not even funny," Tr. II:32-33.

[10] Specifically, MacKay characterized officers attending a promotional ceremony as "brown spots," and said "there was a lot of semen swapping going on in the fucking lobby."  Tr. I:17-18.

- 12 -

intraoffice transfers, the effects of a "rumor mill" on office morale, and the degree of confidence held in various managers. See 461 U.S. at 155-56. The Supreme Court held that the statements did not involve matters of public concern, because the questionnaire did not inform the public of any wrongdoing, or assist in any evaluation of elected officials' performance; it "would convey no information at all other than the fact that a single employee is upset with the status quo." 461 U.S. at 148. "[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." Id. at 149.

The same reasoning applies here. These officers' unhappiness with the way their senior management interacts with them, or their dislike for fellow officers, is not of significant public interest. The tangential relationship between employees' morale or their opinion of senior officers' management abilities and the efficient performance of public duties was not sufficient to protect Connick's speech, see 461 U.S. at 148, and it does not protect these officers' general gripes.

c.    Statements concerning alleged "absenteeism" and the Dudley MBTA Station. Finally, the Complaint claims that MacKay and Jordan were disciplined for calling Chief Carter "No Show Joe," criticizing his failure to appear at the scene of a murder in Dudley Square and otherwise to be a visible representative of the MBTA Police Department, and concerning the murder and the Department's overall response to it. These statements also fail the "public concern" test, if not for their inherent subject matter then because of the "form and context" in which they were made.

- 13 -

In Connick, the Supreme Court made clear that the "public concern" determination requires analysis not merely of what was said, but of "the content, form, and context of a given statement, as revealed by the whole record." 461 U.S. at 147-48.  Accordingly, the Seventh Circuit held in Kokkinis v. Ivkovich, 185 F.3d 840, 844 (7th Cir. 1999) that "speaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern as that term is employed in Connick."  Instead, "it is necessary to 'look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?'" Id. (quoting Callaway v. Hafeman, 832 F.2d 414, 417 (7th Cir. 1987)).  The Sixth Circuit similarly has held "that the proper inquiry is *not* what might be 'incidentally conveyed' by the speech, and that 'passing' or 'fleeting' references to an arguably public matter do not elevate the speech to a matter of 'public concern' where the 'focus' or 'point' of the speech advances only a private interest."  Farhat v. Jopke, 370 F.3d 580, 592-93 (6th Cir. 2004).

Following the same rule in this Circuit, the First Circuit held in Mullin v. Town of Fairhaven,  284 F.3d 31 (1st Cir. 2002), that a court must "examine the extent to which plaintiffs intended their speech to contribute to any 'public discourse,' or if it simply reflected personal or internal [Department] concerns." Id. at 38 (citing O'Connor v. Steeves, 994 F.2d 905, 914 (1st Cir. 1993); see also Fabiano v. Hopkins, 352 F.3d 447, 454 (1st Cir. 2003); Metzger v. DeRosa, 367 F.3d 699, 702 (7th Cir. 2004); Hasty v. City of Gladstone, 247 F.3d 723, 726 (8th Cir. 2001) (no public concern where plaintiff "did not intend to make an

- 14 -

official report," but rather made "offhand" remarks "as part of a casual conversation"); <u>Nunez</u> v. <u>Davis</u>, 169 F.3d 1222, 1227 (9th Cir. 1999).[11]

Considering the plaintiffs' statements in the overall context in which they were made – even those nominally on subjects in which the public might have some interest – none of them involved a matter of public concern because these plaintiffs, like those in <u>Connick</u>, <u>Metzger</u>, and <u>Hasty</u>, commented on these topics solely in the context of complaining about internal personnel matters.

On one occasion, MacKay specifically made that connection, saying "The Chief, right, doesn't even go to murder scenes here, do you think he's thinking about – hmm, let me fuck up their vacation time for this year." Tr. I:128. More generally, the discussion concerning a murder at the Dudley MBTA Station revolved around a <u>Boston Globe</u> newspaper article which attributed several statements to Chief Carter, including references to a revised patrol plan that the Chief said would have provided better security at the station. MacKay and others apparently understood the Chief to be blaming a stalemate in union negotiations for the delay in implementing the plan, and in his recorded conversations MacKay characterized the Chief's statements as blaming the union for the murder. Tr. II:15-20, 22-29, 32-48. As a result, MacKay opined, "we look fucking ridiculous," <u>id.</u> II:24; "that's why you can't take any pride in this fucking shit hole." II:18. MacKay was also frustrated that the union had

---

[11] The court in <u>Metzger</u> explained: "where considerations of motive and context indicate that an employee's speech raised a topic of general societal interest merely for personal reasons rather than a desire to air the merits of the issue, or for the sole purpose of bolster[ing] [her] own position in a private personnel dispute with [her] superiors, these factors militate against the conclusion that the employee's speech is entitled to First Amendment protection." <u>Id.</u> (quoting <u>Campbell</u> v. <u>Towse</u>, 99 F.3d 820, 827 (7th Cir. 1996)).

- 15 -

/- Current/8857238v1

not responded more forcefully to the article; "I'd say, Hey Joe, you know what I'd say, 'that was one missile, and we're going to answer with one, and then we are even.'" II:15; see id. II:29, II:34.

In the overall context that prompted them, those comments were not intended to contribute to any public discourse. MacKay was not bemoaning the plight of subway patrons in a dangerous station; rather, as the transcripts make plain, his frustration arose from his perception that the Chief was publicly holding the unions responsible for the situation, a "missile" that he thought the union should "answer": "the Chief . . . [threw] us under the bus calling us – basically saying that the reason that that kid died at Dudley is because [his] plan isn't into effect." II:115.

After Chief Carter responded to the article by writing a letter to the editor demanding a retraction, MacKay characterized the Chief's letter as "fucking stupid shit" and "a lie." Tr. II:26. "You think he [the Chief] was actually misquoted[?] . . . [W]e get kicked in the fucking balls, because he lied." Tr. II:16. The Chief also sent an internal memo expressing his unhappiness with the newspaper article, which MacKay also read, id. at II:39-40. The ensuing discussion, id. at 40-44 ff., is focused exclusively on the implications for the officers and their union. The statements in question related not to public issues but to employment matters, namely the frayed relationship between MBTA police unions and Department management.

The several references to "No Show Joe"[12] similarly fail the "public concern" test because of their context. MacKay directed none of his name-

---

[12] See Tr. I:24, I:30, I:38, II:51, II:108. MacKay was only charged with a violation for one of these comments. See Fact Statement Tab K at 2.

- 16 -

calling to the press, or to the public, or up the chain of command in an effort to correct or even to complain about any dereliction of duty; his comments were strictly an outgrowth of his discontent with working conditions and his disrespect for the Chief as a leader of the Department.  For example, the first of these comments, Tr. I:24, comes in the context of a complaint about how Chief Carter was dealing with jurisdictional disputes between the MBTA Police Department and the Boston Police Department, which MacKay apparently thought was detrimental to the standing of the MBTA police.  See id. at I:18-24; MacKay Dep. at 68-69.[13]  Another was a conversation about how the Chief's alleged absenteeism affected his ability as a leader of the MBTA police officers. See Tr. I:30.   These are precisely the sort of complaints about internal personnel matters that the public concern test excludes.  Like the statements at issue in Kokkinis,  "the point of the plaintiff's speech was simply to further his own goal of expressing his displeasure with the Chief's policies."  185 F.3d at 844.   None of the statements that plaintiffs allege were the basis for discipline addressed matters of public concern, and defendants are entitled to summary judgment.

      d.  Union activities.   In deposition, MacKay raised a new possibility not alleged in the Complaint: that perhaps he was terminated because he was contemplating running for union president, and "they didn't want someone probably or maybe as outspoken or opinionated as I am in that position." MacKay Dep. at 97.  "[I]t makes the Chief's job easier if he didn't have anybody

---

[13] During the same conversation MacKay objected to "the Chief . . . coming out with all his fucking foolishness," Tr. I:24, which MacKay testified in deposition might well have been a reference to changes in vacation scheduling.  MacKay Dep. 69.

in there that is combative. . . . Larry Culbert they believed they could deal with easier than me." Id. at 103; see id. at 104.

This new assertion (which does not appear in the Complaint) fails for the same reasons as MacKay's other claims.  He testified that he never made complaints to senior commanders or to the public, except that "I'm sure we've had discussions when they changed the policies and procedures."  MacKay Dep. at 32-33, 46.    Thus, the "outspokenness" to which MacKay refers were statements about internal grievances and complaints about Departmental policies and procedures – matters in which the union may, understandably, have a sharp interest, but in which the public does not.

Even leaving aside the utter lack of evidence that the Department was so motivated[14] and assuming, for purposes of this motion, that the Department fired MacKay to keep him out of the union leadership, defendants would still be entitled to summary judgment on the First Amendment claim that is before the Court.  The analysis of such claims for free-speech purposes is precisely the same: whether the alleged "outspoken" opinions were on matters of public concern under Connick and whether MacKay's interest in expressing those views outweighed the Department's interests in efficiency, respect for superior officers, and related concerns, under Pickering.  As the First Circuit has held:

> Ordinarily, conduct intended to express anger at a supervisor towards whom one bears personal animosity because of family history and/or a prior personnel decision does not relate to a matter of public concern. **So too, we think, with conduct intended to express solidarity with another's perceived intent to provoke** -- regardless whether the other's

---

[14] Summary judgment is appropriate where the non-moving party relies on "conclusory allegations, improbable inferences, and unsupported speculation." Straughn v. Delta Airlines, Inc., 250 F.3d 23, 33 (1st Cir. 2001).  MacKay's allegations amount to no more than that.

animus might be thought to arise from frustration over a matter of public concern. Such conduct itself is not calculated to provide members of society with information necessary to make informed decisions about government operations, to disclose public misconduct, or to inspire public debate on a matter of significant public interest. It is thus subject to regulation in the public employment context without court oversight.

Meaney v. Dever, 326 F.3d 283, 289 (1st Cir. 2003) (emphasis added). MacKay in his newly-alleged outspokenness was not attempting to spark public debate or disclosure; he was complaining about changes in working conditions. He has no First Amendment claim on that basis.

> **2.** **Plaintiffs' Minimal Interest In Making The Statements Was Outweighed By The MBTA's Legitimate Interest In Maintaining Discipline And Morale In The Police Force.**

Even a statement that involves a matter of public concern does not form the basis of a First Amendment claim if it "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 482 U.S. 378, 388 (1987). As noted above, under Pickering, this second step of the test requires the Court to balance the employee's interest in commenting on matters of public concern against these important interests of the agency as employer.

Innumerable cases hold that the balance is weighted heavily in favor of the employer when the employer is a police department. Special deference, courts universally hold, must be accorded to the unusual needs of such a paramilitary organization, where "discipline and respect for the chain of command are critical to accomplishing the entity's mission of maintaining order and public safety." Williams v. Seniff, 342 F.3d 774, 784 (7th Cir.

- 19 -

2003).[15] <u>See</u> <u>also</u> <u>Oladeinde</u> v. <u>City</u> of <u>Birmingham</u>, 230 F.3d 1275, 1293 (11th Cir. 2000) (citing the "heightened need for order, loyalty, morale, and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers"); <u>Kokkinis,</u> 185 F.3d at 845 ("[d]eference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement"); <u>O'Donnell</u> v. <u>Barry</u>, 148 F.3d 1126, 1135 (D.C. Cir. 1998) ("because of the special degree of trust and discipline required in a police force there may be a stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees"); <u>Campbell</u> v. <u>Towse</u>, 99 F.3d 820, 829-30 (7th Cir. 1996) ("It surely cannot be doubted that individuals who work in the highest echelons of the command of a police department must be assured of the loyalty of their immediate subordinates, as these subordinates are entrusted with carrying out their orders"), <u>cert.</u> <u>denied</u>, 520 U.S. 1120 (1997).[16]

That deference expressly extends to departmental responses to police officers' negative comments about their superior officers.  <u>See, e.g., Stanley</u> v.

---

[15] <u>See</u> <u>also</u> <u>id.</u> (citing <u>Dill</u> v. <u>City</u> of <u>Edmond</u>, 155 F.3d 1193, 1203 (10th Cir. 1998) (government has a "heightened interest . . . in maintaining discipline and harmony among employees" of law enforcement agencies); <u>Tyler</u> v. <u>City</u> of <u>Mountain</u> <u>Home</u>, 72 F.3d 568, 570 (8th Cir. 1995) (paramilitary character and mission of police departments results in greater latitude in discipline and personnel matters than a normal government employer); <u>Klunk</u> v. <u>County</u> of <u>St. Joseph</u>, 170 F.3d 772, 776 (7th Cir. 1999) (a police officer's position imposes a duty of loyalty and confidence)).

[16] <u>See</u> <u>generally</u> <u>Kelley</u> v. <u>Johnson</u>, 425 U.S. 238, 246 (1976) (recognizing the need to accord police departments wide latitude in decisions that impact "discipline, esprit de corps, and uniformity"); <u>Moore</u> v. <u>City</u> of <u>Wynnewood</u>, 57 F.3d 924, 934 (10th Cir. 1995) (government's interest is "particularly acute in the context of law enforcement, where there is a heightened interest . . . in maintaining discipline and harmony among employees").

City of Dalton, Ga., 219 F.3d 1280, 1290 (11th Cir. 2000) (police department
has a strong interest in preventing its officers from making unfounded
accusations against a superior officer because it "could be considered
disruptive and potentially undermining to the mutual respect and confidence
needed for fellow officers in a police department"); Busby v. City of Orlando,
931 F.2d 764, 774 (11th Cir. 1991) ("In quasi-military organizations such as law
enforcement agencies, comments concerning co-workers' performance of their
duties and superior officers' integrity can directly interfere with the
confidentiality, esprit de corps and efficient operation of the police
department.").

 The statements at issue in this case can fare no better than statements
that other courts have held to fail the Pickering balancing test despite the
arguable public interest in their subject matter.  For example, in Cochran v.
City of Los Angeles, 222 F.3d 1195 (9th Cir. 2000), the plaintiffs complained
about allegedly preferential treatment of minorities, going over their immediate
supervisor's head to do so, and criticized a fellow officer who ignored a union
request that officers call in sick on a designated day to support the union in
negotiations with the police department.  Id. at 1197-98.  The Ninth Circuit
held that the department's "significant interest" in responding to the plaintiffs'
statements outweighed the officers' interest in making them, because the
statements "directly challenged [the immediate supervisor's] ability to make
decisions free from personal bias or preferences, and undermined her
authority."  Id. at 1200.  And in Kokkinis, the plaintiff's complaints in a
television interview about the vindictiveness of the police chief failed the
Pickering test because they "adversely affected harmony and loyalty among co-

- 21 -

workers" and "at least potentially endangered their working relationships," and his "criticism of the Chief on television . . . constituted a challenge to the Chief's authority and management style."  185 F.3d at 846.

The same can be said about all of the allegedly protected statements in this case.  First, the Department has an obvious interest in preventing access to confidential criminal records because an officer is curious about an attractive woman he sees on television, or because an officer in drug rehab wants to do favors for fellow patients.

Second, there is no question that plaintiffs challenged their Chief's "authority and management style," and that of Deputy Chief Martino, and that the statements had at least the potential to undermine loyalty and obedience of plaintiffs and their colleagues to senior officers.  Most of the statements at issue do so directly: calling the Chief a "liar" and characterizing his policies as "fucking foolishness"; criticizing the breadth of Deputy Chief Martino's authority and alleging that he acts capriciously ("just to fuck with you"); calling the command staff "fucking stupid"; and characterizing the entire Department (as a "shit hole"; as "the most fucked up regime in the history of the MBTA Police Department").

Third, the remaining statements, though less profane, have a similar effect.  Calling the Chief of Police "No Show Joe," and insisting that his absence from crime scenes arises from apathy and insufficient attention to the publicity needs of MBTA patrolmen, obviously undermines his authority.  MacKay similarly has little legitimate interest in calling fellow officers childish names ("retard," "idiot," "brown spots," and the like) as compared to the Department's

- 22 -

interest in avoiding such epithets – at least on recorded telephone lines dedicated to official business.

Further, as a matter of law, the Department was entitled to act on those concerns without waiting to see whether plaintiffs' statements actually disrupted the Department.  See, e.g., Connick, 461 U.S. at 152 (employer need not "allow events to unfold to the extent that disruption of the office and the destruction of working relationships is manifest before taking action"); Cochran, 222 F.3d at 1200-1201; Kokkinis, 185 F.3d at 845-46 (employer "is not required to wait until those working relationships actually disintegrate").

By contrast, the plaintiffs' interest in criticizing their superior officers – let alone requesting protected criminal history information for personal reasons – is negligible.  Here, again, the plaintiffs' motives for making the statements is relevant; statements made from "self-interest," even on matters otherwise of public concern, are entitled to "little weight" in the Pickering balance. O'Connor, 994 F.2d at 915 (quoting Versarge v. Township of Clinton, 984 F.2d 1359, 1366 (3rd Cir. 1993)); Mullin, 284 F.3d at 39; see also Guilloty Perez, 339 F.3d at 53 ("the greater the value of the speech to the public, the more the balance tilts towards permitting the employee to express himself").  For the reasons explained in the preceding section, plaintiffs' speech had little value to the public, because the statements were made primarily, if not exclusively, to complain about the internal relationship between superior officers and their subordinates.  But even if the Court were to find sufficient public concern in those statements to satisfy the first prong of the test, their minimal value would fail the second prong, the Pickering balance.  Here, as in Mullin,

- 23 -

> the import of that [public] concern [is] diminished by plaintiffs' preoccupation with personal disagreements and internal disputes over the workings of the [Department]. . . . Plaintiffs are hard pressed to elevate the First Amendment stakes by invoking the interests of the community in a public discourse that they appear to have done so little to foster.

284 F.3d at 39-40.  Not one of MacKay's or Jordan's comments was directed at any effort to bring wrongdoing to light, either to the public's attention or even to senior officers in the Department.  They were simply grousing about working conditions.  Such grumbling is not protected by the First Amendment.

### B.    Chief Carter Is Immune From Suit In His Individual Capacity.

A government employee such as Chief Carter is immune from damages for alleged free speech violations "where a reasonable official could believe (the test is objective), [even] mistakenly, that his conduct did not violate the First Amendment." Dirrane v. Brookline Police Dept., 315 F.3d 65, 69 (1st Cir. 2002) (citing Harlow v. Fitzgerald, 457 U.S. 800, 817-19 (1982)).  This qualified immunity analysis requires a plaintiff pursuing a defendant in his individual capacity to prove both that the defendant violated a constitutional right, and further that the right in question was "clearly established" under the circumstances.[17]  The latter test requires judgment for the defendant unless the plaintiff can prove that the defendant violated such a well-established prohibition that "a reasonable officer *must* have known that he was acting unconstitutionally." Id. at 71.

---

[17] See, e.g., Fabiano, 352 F.3d at 453; Wilson v. Layne, 526 U.S. 603, 609 (1999) (courts "'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'") (quoting Conn v. Gabbert, 526 U.S. 286, 290 (1999)).

- 24 -

The Court denied defendant Carter's motion to dismiss the claims against him individually on grounds of qualified immunity. At that time, however, the Court did not have the transcripts of the conversations in question, or the fuller factual record now provided by deposition testimony. On that record, there can be no question that plaintiffs have failed to show either that Chief Carter violated any constitutional right, much less that the right in question was so "clearly established" as to permit a reasonable jury to conclude that Chief Carter knew he was violating the plaintiffs' constitutional rights.

Even assuming that plaintiffs could establish a constitutional claim against the Department – which, as shown in Part A, they have not – they cannot show that the constitutional right on which their claim rests was "clearly established" within the meaning of the qualified immunity doctrine. "For the law to be clearly established, the law 'must have earlier been developed in such a concrete and factually defined context to make it **obvious** to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." Stanley, 219 F.3d at 1285 (quoting Lassiter v. Alabama A&M Univ. Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)) (emphasis added). "In other words, a police chief can guess wrong about the constitutionality of his conduct, provided the mistake is a reasonable one." Id. at 1294.

As the First Circuit has held, that burden is "especially difficult" in a First Amendment case, Fabiano, 352 F.3d at 457, because the uncertainty inherent in the Pickering balancing test makes it challenging to demonstrate that a reasonable public officer "**must** have known" he was acting unconstitutionally. As the First Circuit explained in Fabiano:

- 25 -

> "Because <u>Pickering</u>'s constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered 'clearly established'" for purposes of qualified immunity. <u>O'Connor</u>, 994 F.2d at 917 n.11 (quoting <u>Bartlett</u> v. <u>Fisher</u>, 972 F.2d 911, 916-17 (8th Cir. 1992) (internal quotation marks omitted)); <u>see</u> <u>also</u> <u>Frazier</u> v. <u>Bailey</u>, 957 F.2d 920, 931 (1st Cir. 1992) ("if the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual or legal precedent").

<u>Fabiano</u>, 352 F.3d at 457.

As the Ninth Circuit similarly explained, qualified immunity in First Amendment cases "'depends upon the sensitive ad hoc balancing that <u>Pickering</u> entails,'" and accordingly the plaintiff cannot survive summary judgment unless "a reasonable jury could [find] that 'the outcome of the <u>Pickering</u> balance so clearly favored . . . [plaintiff] that it would have been patently unreasonable for the . . . officials to conclude that the First Amendment did not protect [her] speech.'" <u>Brewster</u> v. <u>Bd. of Educ.</u>, 149 F.3d 971, 980 (9th Cir. 1998).[18]

On this summary judgment record, the plaintiffs cannot, as a matter of law, meet the heavy burden of showing "the sort of unusual circumstances that would support the finding of a clearly established right notwithstanding <u>Pickering</u>." <u>Fabiano</u>, 352 F.3d at 457-58. Even if the Court should conclude that the statements at issue here were of sufficient public concern to invoke First Amendment protection, and that they carry enough weight in the <u>Pickering</u> balance to raise an issue, there is no credible argument here that the

---

[18] <u>See</u> <u>also</u> <u>DiMeglio</u> v. <u>Haines</u>, 45 F.3d 790, 806 (4th Cir. 1995) ("the outcome of the balancing test can "only infrequently" be said to be "clearly established"); <u>Hansen</u> v. <u>Soldenwagner</u>, 19 F.3d 573, 576 (11th Cir. 1994) ("Because <u>Pickering</u> requires a balancing of competing interests on a case-by-case basis . . . only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated 'clearly established' federal rights.").

- 26 -

plaintiffs' statements were so ***obviously*** protected, and the Chief's interest in maintaining discipline and respect for senior officers so ***obviously*** outweighed by the plaintiffs' interest in complaining among themselves, that a reasonable official in the Chief's position would have known it was unconstitutional to impose discipline, and that any other outcome was "patently unreasonable."

The vast majority of cases in the First Circuit involving questions of First Amendment rights and qualified immunity are cases from the District of Puerto Rico involving allegations of political animus in hiring and discharge (most recently Bisbal-Ramos v. City of Mayaguez, 467 F.3d 16, (1st Cir. 2006)), which offer little guidance with respect to plaintiff's claims.  Outside of the political animus line of cases, the First Circuit has rarely denied the defense of qualified immunity, and nearly all of those few cases involve discrimination against a public official for either a vote or a position taken at a public meeting of the agency.[19]  Those cases again offer little guidance to a police chief trying to maintain discipline and respect for command staff in a police department.

The First Circuit cases most factually analogous to this case suggest that there is no clearly established law governing discipline in police departments for speech critical of senior officers.  The Court has upheld the qualified immunity defense in such cases, and we are aware of no case holding free speech rights in this context to be "clearly established."  See, e.g., Wagner v. City of Holyoke, 404 F.3d 504 (1st Cir. 2005); Dirrane v. Brookline Police Dept., 315 F.3d 65 (1st Cir. 2002).  To the contrary, both Wagner and Dirrane note the

---

[19] See, e.g., Mihos v. Swift, 358 F.3d 91 (1st Cir. 2004); Stella v. Kelley, 63 F.3d 71 (1st Cir. 1995).  But see Mullin v. Town of Fairhaven, 284 F.3d 31 (1st Cir. 2002) (rejecting First Amendment claims of removed members of town conservation commission).

/- Current/8857238v1

difficulty of overcoming immunity in cases that involve the <u>Pickering</u> balancing test, because of the uncertainty inherent in such a test, and because in both cases the plaintiff officers had made a mixture of protected and unprotected comments which made the unconstitutionality of discipline even less clear. <u>See</u> <u>Wagner</u>, 404 F.3d at 509 (officer's "broad range of complaints (some consisting of unprotected and antagonistic speech)" and his other disobedience permitted a reasonable belief that discipline was permissible, and any mistake in that regard was not "egregious"); <u>Dirrane</u>, 315 F.3d at 71 (qualified immunity where "the serious charges that Dirrane made were nestled in a morass of complaints").

Decisions from other circuits mirror the analysis of the <u>Wagner</u> and <u>Dirrane</u> decisions, as described more fully in the preceding section. The case law, taken as a whole and used as legal guidance in making disciplinary decisions that inevitably turn on unique sets of facts, strongly affirms the defendants' latitude in this case to take disciplinary action against Jordan and MacKay for the statements at issue. That is particularly true where, here as in <u>Wagner</u> and <u>Dirrane</u>, the most that could possibly be said for the plaintiffs' position is that there was a mix of protected and unprotected statements. As explained in Part A above, none of the plaintiffs' statements was constitutionally protected; but even if Chief Carter were uncertain about that conclusion when he decided to terminate the plaintiffs' employment in 2004, it was beyond question that the plaintiffs' use of the CORI computer system to obtain warrant information on acquaintances, for personal matters, and out of sheer curiosity was unprotected conduct. No reasonable jury could find that Chief Carter "must have known" that disciplinary action against the plaintiffs

- 28 -

was unconstitutional.   He accordingly is immune from suit and entitled to summary judgment on the claims against him in his individual capacity.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment should be granted.

Respectfully submitted,

MBTA POLICE DEPARTMENT
CHIEF JOSEPH C. CARTER

By their attorneys,


/s/ Mark W. Batten_____
Mark W. Batten
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
(617) 526-9850

Dated: December 15, 2006


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record, either through the electronic filing process or by first-class mail, postage prepaid, this 15th day of December, 2006.


/s/Mark W. Batten_____
Mark W. Batten