UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RONALD JORDAN, ROBERT McKAY, and THE MBTA POLICE PATROLMAN'S UNION,<br><br>            Plaintiffs,<br><br>vs.<br><br>JOSEPH C. CARTER, individually and as Chief of the MBTA Police Department and THE MBTA POLICE DEPARTMENT,<br><br>            Defendants. | Civil Action No. 04-10927-RGS |

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, defendants hereby submit that the following facts are undisputed for the purposes of their motion for summary judgment.

1. Defendant Joseph C. Carter was appointed Chief of the MBTA Police Department effective January, 2003. Deposition of Chief Joseph Carter ("Carter Dep.") at 4. True and correct copies of excerpts from Chief Carter's deposition are attached hereto at Tab A.

2. Before Chief Carter's MBTA appointment, there were concerns in the community, expressed in the findings of a community task force, that the MBTA Police Department (the "Department") was engaged in racial profiling, and had taken excessive enforcement action against young people riding the MBTA. Id. at 88.

3. Plaintiffs Ronald Jordan and Robert MacKay believe that Chief Carter, who is African-American, was appointed in part because of his race, "to

try to appease the Roxbury public." Deposition of Ronald Jordan ("Jordan Dep.") at 33; see Deposition of Robert MacKay ("MacKay Dep.") at 36-37. True and correct copies of excerpts from the Jordan and MacKay depositions are attached hereto at Tabs B and C, respectively.

4.  Shortly after his appointment, Chief Carter created a process to involve both members of the Department, community leaders, and youth "about all aspects of the department administration" to develop a plan of action "for a new manner in which to police the MBTA." Carter Dep. at 89.

5.  On February 24, 2004, Lieutenant Detective Mark Gillespie was listening to tapes of recorded telephone conversations involving MBTA police officers. Deposition of Mark Gillespie ("Gillespie Dep.") at 17. True and correct copies of excerpts from the Gillespie Deposition are attached hereto at Tab D.

6.  Gillespie was listening to tapes because two officers under his command had been involved in an altercation with a state trooper on February 10, 2004, and he thought there might be conversations relevant in determining what had happened. Id. at 8-13, 17-19.

7.  In the course of listening to these tapes Gillespie listened to conversations taped on February 18, 2004. Id. at 17. He testified that he did so because he was unfamiliar with the software for reviewing the tapes and was not expert at selecting the date of conversations to review. Id. at 17-19.

8.  Gillespie overheard conversations involving plaintiff Robert MacKay which he believed were in violation of Department rules and regulations. Id. at 21-22.

9.  At the time, MacKay was assigned to the Monitor Room, where, among other duties, he was responsible to answer emergency telephone lines,

...

and had authority to conduct computerized queries for information on individuals' outstanding warrants, probation records, and Registry of Motor Vehicles information. MacKay Dep. at 12-13, 16-18.

10. Among the telephone lines that MacKay was responsible to answer was the "1205 line" (617-222-1205), on which he frequently spoke to other MBTA police officers calling in from the field. See id.

11. Gillespie orally reported the conversations he had overheard to Deputy Chief Thomas McCarthy. Id. at 22-23; Deposition of Thomas McCarthy ("McCarthy Dep.") at 13.[1] True and correct copies of excerpts from the McCarthy Deposition are attached hereto at Tab E.

12. McCarthy consulted with Chief Carter, who authorized an investigation of the taped conversations, and after consulting with the MBTA's General Counsel, McCarthy himself began listening to conversations recorded during MacKay's shift over a period of several months. McCarthy Dep. at 20-22.

13. As they relate to the plaintiffs in this case, McCarthy summarized the results of his investigation in two memoranda to Chief Carter dated March 8, 2004. True and correct copies of the memoranda are attached hereto at Tabs F and G.

14. True and correct copies of transcripts of the conversations in question are attached hereto at Tabs H and I.

---

[1] Gillespie testified that he listened to the conversations himself; McCarthy testified that Gillespie told him that the two detectives involved in the altercation had done the listening. McCarthy Dep. at 15. The difference is not material and defendants do not insist on one version of these facts over another.

15. By letters dated April 13 and 14, 2004 to Jordan and MacKay, respectively, the Department notified the plaintiffs of disciplinary hearings involving their recorded conversations. True and correct copies of these letters are attached hereto at Tabs J and K.

16. With respect to Jordan, the alleged violations primarily concerned his calling MacKay and obtaining Criminal Offender Records Information ("CORI"), which is protected by statute, on three individuals. See Tab J; Mass. Gen. L. c. 6, §278.

17. MacKay had access to the Department computer that permits such searches, a password-protected computer to which access is granted only after special training and testing. MacKay Dep. at 24-25.

18. Specifically, while in an inpatient drug rehabilitation clinic (and, therefore, not on duty), Jordan had called MacKay and obtained outstanding warrant information at the request of two of his fellow inpatients at the clinic. Jordan Dep. at 71-72, 74-75; Tr. I:12-14, 26-29. On another occasion, Jordan called MacKay for Registry information and Board of Probation records concerning a Kevin Mitchell, whom Jordan says had taken $2,500 from his sister for certain work and then "never showed up." Jordan Dep. at 75-76; Tr. II:53. In the conversation Jordan told MacKay that he was "trying to figure out what he's got for an address, I might have someone go say hi." Tr. II:55; Jordan Dep. at 77. "The squid might come by," Jordan said.[2] MacKay noted

---

[2] Jordan testified in deposition that he was joking about the reference to the "Squid," "a strange looking kid" who was a mutual acquaintance of Jordan and McKay. Jordan Dep. at 78-79. He testified that his reference to having "someone go say hi" was a reference to a "very good friend" who is a Chelsea police officer. Id. at 77.

that Mitchell was on probation and warned Jordan that "we['re] going to hear it on this one when they call back." ". . . Well, you can just tell them. If they want, they can call me if they give you any shit," Jordan replied. Tr. II:58-59.

19.    In addition to these alleged CORI violations, Jordan was charged with insubordination for a conversation in January 2004, when he responded to a Sergeant Douglas by saying "I got a nice big stiff cock for you." Tr. I:98.[3]

20.    MacKay was charged with violations in several categories. See Tab K. First, he was charged with violations of CORI, for the several checks he ran at Jordan's request, and also for two others. First, at the request of a civilian apparently unknown to MacKay but who had obtained the phone number from another officer, MacKay ran a license plate number and provided information about the vehicle's owner and her address. Tr. II:97-100. The caller gave no reason for the request, and MacKay did not ask. See id.

21.    Second, later that same day, MacKay was speaking with a friend while both were watching a television game show called "Fear Factor." Tr. II:127-30 ff. One of the contestants, a female, was described as from Massachusetts, and MacKay said "She looks fucking nice." Id. at 128. "What does she look around 20?" the caller asked; "Hold on, just punching something in here," MacKay replied. "Yeah, right there, buddy, [birthdate]." Id. at 129. MacKay then gave a street in Medford, the address of the woman. "Oh, I know where that is," said the caller. "That must be an apartment, huh?" Id. "I guess," MacKay replied, and gave the birthdate again. The caller repeated the address. "Dirty bitch," the caller said. Id. MacKay later testified that he

---

[3] Jordan again contends that he was joking, that Sergeant Douglas was a friend and former partner. Jordan Dep. 65.

- 5 -

obtained the woman's address and birthdate out of "curiosity," and acknowledged that the information was not available to the general public. MacKay Dep. at 110.

22.  In addition to the charges concerning confidential information, MacKay was charged with making a variety of disrespectful statements about senior commanders in violation of Department regulations. See Tab K at 2.

23.  Most of these statements arose from conversations in the wake of a stabbing murder at the Dudley station of the MBTA. MacKay Dep. at 42. MacKay was upset both because Chief Carter had not appeared at the murder scene, and because in a Boston Globe article about the stabbing Chief Carter made comments suggesting, to MacKay, that the crime might have been prevented if the Chief's new patrol plan had been in effect, but that the plan had been held up by negotiations with the patrolmen's union. Id. at 42-43, 77-78.

24.  In a variety of ensuing conversations, MacKay told other officers that Chief Carter was a "fucking liar"; that his policies amounted to "fucking foolishness"; that the command officers "don't give a fuck" and "are so fucking stupid it is not even funny"; and that as a result "you can't take any pride in this fucking shit hole." Tab K at 2-3; see Tr. II:15-20, 22-29, 32-48. MacKay testified in deposition that the reference to "fucking foolishness" might well have been a reference to changes in vacation scheduling. MacKay Dep. 69.

25.  MacKay interpreted the Chief's comments as aimed at the union, "a nice missile you just sent right across our bow," and that the union should "answer with one, and then we're even." Tr. II:15, 34.

26. MacKay responded to a letter to the Globe editor by calling it "fucking stupid shit" and "a lie." Tr. II:26. He also said: "You think he [the Chief] was actually misquoted[?] . . . [W]e get kicked in the fucking balls, because he lied." Tr. II:16.

27. Of the three dozen charges against MacKay, one violation related to disrespect for calling Chief Carter "No Show Joe" in a December 2003 conversation. Tab K at 2; Tr. I:38.

28. The transcript shows that the "No Show Joe" reference occurred toward the end of a conversation with another officer complaining about fellow officers and the hardships of outdoor assignments during the winter. See Tr. I:32-38.

29. MacKay also was charged with violations for a number of remarks about Deputy Chief Martino, which seem to have been grounded in complaints that Chief Carter had given Martino too much discretion and that he was using that authority to make unfavorable changes in vacation scheduling and similar matters. See, e.g., Tr. I:126-28, 140.

30. MacKay was also charged with violations of Department regulations for apparently discriminatory comments, including a discussion of a talk radio host's comments about gay marriage, including "I hope they all drop dead"; a comment about a warrant check on a black male; and similar remarks. Tab K at 3-5; Tr. I:18, 100, II:63.

31. MacKay was also charged with violations for comments about fellow officers. Among other things MacKay called other officers "retard," "fucking idiot," and "fucking kid." See Tab K at 2-3; Tr. I:34, 35, II:178-79.

32.  In another conversation MacKay objected to officers attending a promotional ceremony as sycophants, calling them "brown spots" engaged in "semen swapping." Tr. I:17-18.

33.  After a hearing, a hearing officer of the MBTA found just cause to support the alleged violations of the CORI statute and Department rules and regulations, and recommended that Jordan and MacKay be terminated. Carter Dep. at 73. A true and correct copy of the hearing officer's decision concerning Jordan and MacKay is attached hereto at Tab L.

34.  Chief Carter adopted the hearing officer's recommendation and terminated Jordan's and MacKay's employment. Carter Dep. at 73.

35.  Arbitrators addressing grievances filed by Jordan and MacKay under the applicable collective bargaining agreement subsequently reduced that discipline to a one-day and five-day suspension for Jordan and MacKay, respectively.

36.  MacKay has never made complaints to the public or to the command staff apart from union negotiations. MacKay Dep. at 32-33 ("I'm sure we've had discussions when they changed the policies and procedures."), 46.

37.  Jordan testified that he has complained about "manning," "safety," "contract negotiations, pension, typical union issues," Jordan Dep. at 23. He also testified that he has not had a negative response from senior officers about his tendency to speak his mind. His complaint about "manning" was that he believed too many officers were assigned where they were not needed and too few where they were needed. Id. at 24. His complaint about "safety" was

actually an objection to Chief Carter's alleged statements in the <u>Globe</u> concerning the revised patrol plan.  <u>Id</u>. at 25-26.

                                        Respectfully submitted,

                                        MBTA POLICE DEPARTMENT
                                        CHIEF JOSEPH C. CARTER

                                        By their attorneys,


                                        /s/ Mark W. Batten
                                        Mark W. Batten
                                        PROSKAUER ROSE LLP
                                        One International Place
                                        Boston, MA 02110
                                        (617) 526-9850

Dated: December 15, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record, either through the electronic filing process or by first-class mail, postage prepaid, this 15th day of December, 2006.

                                        /s/Mark W. Batten
                                        Mark W. Batten