## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### CA NO. 04-10927-RGS

**RONALD JORDAN, ROBERT MACKAY,**
     **Plaintiffs,**

**v.**

**JOSEPH C. CARTER, Individually and as Chief of the MBTA Police Department, and MBTA POLICE DEPARTMENT,**
     **Defendants.**

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.     INTRODUCTION

The plaintiffs, Ronald Jordan and Robert MacKay, oppose the defendants' motion for summary judgment. This is a fact intensive case in which reasonable inferences are available that would support plaintiffs' theory of the case: They were disciplined for speaking out on matters of public concern and that such protected speech was a substantial and motivating factor behind the adverse employment action. As such, with such inferences available, summary judgment should be denied and the case be submitted to a jury.

### II.     FACTS

1.     Robert MacKay was appointed to the MBTA Police Department in 1992. Previously, he was employed by the Town of Reading as a police officer. <u>See</u> MacKay deposition pages 8-9, Tab A.

2.      Officer MacKay as assigned to the monitor room at the MBTA Police station around

        1996-1997.  MacKay deposition page 10. TAB A

3.      MacKay was elected as vice-president of the Union (MBTA Police Association) in 1996.

        MacKay deposition page 11. Id.

4.      He served in that position until 1999 and then was re-elected in 2005.  MacKay

        deposition page 15. TAB A

5.      MacKay's shift while working in the monitor room was Monday-Friday, 3:00 p.m.-11:30

        p.m. MacKay deposition page 16. TAB A

6.      Part of his responsibilities in the monitor room was to answer several different phone

        lines which the public could call in as well as MBTA police personnel.   The  "1205"

        line was not a public line but was only accessed after cycling through other lines that

        were no answered.  MacKay deposition pages 13-18. TAB A.

7.      MacKay would also run registry checks and warrant inquires for police personnel who

        called in via the 1205 line for such information.  MacKay deposition pages 17-20. TAB

        A

8.      Prior to his termination by the MBTA in April 2004, Officer MacKay had never been the

        subject of disciplinary proceedings in connection with his employment with the MBTA

        Police Department.  MacKay deposition page 60. TAB A

9.      Officer Ronald Jordan was appointed to the MBTA Police Department in 1989.   He left

        the department in the early nineties to work for the Braintree Police Department and then

        returned to the MBTA Police Department.  Ronald Jordan deposition pages 6-8, TAB C.

10.     Jordan worked in the patrol division usually during the 6:00 p.m. to 2:00 a.m. shift.

Jordan deposition, pages 10-11. TAB C

11.     In February 2004, during the relevant period, Officer Jordan was out of work through the MBTA's EAP program attending counseling for a substance abuse problem. Jordan deposition pages 12-13. TAB C

12.     Prior to his termination, Jordan had incurred a 3 day suspension for supposed discourtesy towards a civilian during a traffic stop. TAB C

13.     In March 2004, Officers Jordan and MacKay were summoned to the MBTA Police Station where they were relieved of duty by Chief Carter and notified of the charges against them. Chief Carter ordered the activation of the MBTA's "SOT" team (Special Operations) to stand guard in the hallway outside Chief Carter's office. This was the first time and only time since that the SOT had been activated for that purpose. See Chief Carter's deposition pages 54-56, TAB D, Jordan deposition page 62, MacKay deposition page 52. TABS A AND C

14.     In April 2004, following a hearing before Kevin McDermott, Assistant General Counsel for the MBTA, Officers Jordan and MacKay were terminated from employment with the MBTA Police Department.

15.     On May 11, 2004, Deputy Dolores Ford-Murphy of the MBTA Police Department swore out criminal complaints at the Roxbury District Court. against Officers Jordan and MacKay for alleged violations of CORI (G.L. c. 6 Section 178). See application for complaints, TAB E

16.     This was the first and only time to date that the MBTA Police Department had sought criminal complaints against one of its own employees. See deposition of Thomas

-3-

McCarthy, page 52, TAB B,  Deputy Murphy, page 33-34, TAB F

17.   The plaintiffs filed the instant action with this court on May 10, 2004.  <u>See</u> instant

docket.

18.   On November 15, 2003, Officer Brian Harer, was given an informal counseling for

harassing a citizen during a motor vehicle stop and after receiving word of the citizen's

complaint, running a BOP (Board of Probation) check on the complainant without proper

authorization.  <u>See</u> November 13, 2003, notice from Chief Carter. TAB G.

19.   Officer Harer was not terminated from employment nor were criminal charges brought

against him.  Deposition of Chief Carter, Page 76. TAB D

20.   Deputy Murphy was "surprised" that Officers Jordan and MacKay were terminated

because it was more harsh than previous discipline that she was familiar with.  <u>See</u>

deposition of Deputy Murphy, page 51 TAB F.

21.   Lt. Mark Gillespie has run warrant checks, license checks for friends who requested the

information.  <u>See</u> deposition of Lt. Gillespie pages 39-40. TAB H

22.   Not all officers who, during the audit of the 1205 line, who violated departmental rules

and regulations or standards of conduct were subject to disciplinary action by the MBTA.

<u>See</u> deposition of Deputy Murphy, page 59-61, TAB F, Deputy Thomas McCarthy, page

66. TAB B.

23.   Officers Jordan and MacKay filed grievances over their termination which were carried

forward to arbitration wherein arbitrators overturned their terminations and imposed a

one day and five day suspension.

24.   Officers Jordan and MacKay were found not guilty of all criminal charges following a

bench trial before the Roxbury District Court.

25.     On February 24, 2004, Lt. Gillespie of MBTA claimed that in connection with an investigation into an incident involving MBTA police personnel and a state trooper, he began to listen to recorded conversations from the 1205 line.  The incident in question occurred on February 10, 2004.  See report dated March 24, 2004, TAB I and deposition of Lt. Gillespie, pages 9-13, TAB H.

26.     Lt. Gillespie however,  informed Deputy Thomas McCarthy that it was two detectives (Mui and Valente) who were listening to recorded lines.  McCarthy Deposition pages 13-15, Tab "B".

27.     Lt. Gillespie testified that he listened to recorded conversations from February 18, 2004, despite the fact that the incident which was the subject matter of the investigation occurred on February 10, 2004.  See report dated March 24, 2004, TAB I and deposition testimony of Lt. Gillespie pages 17-20. TAB H

28.     Lt. Gillespie claimed that he did not know how to use the playback machine and that is why he listened to the wrong date.  This is despite his understanding that in order to playback a specific date and time, you have to enter it into the system.  Id at page 19.  Lt. Gillespie never informed Deputy McCarthy that he made a mistake when attempting to access recorded conversations from February 10, 2004[1].  See deposition of Thomas McCarthy page 19. TAB B

29.     Lt. Gillespie continued to listen to recorded conversations on February 18, 2004,

---

[1]Curiously, Lt. Gillespie was unable to retrieve any conversations from February 10, 2004 relative to his purported investigation into the incident involving MBTA Police Detectives and a state trooper.  Lt. Gillespie deposition pages 44-45.

knowing full well that he had made mistake and had the wrong date.  Id., at 20-21. TAB H

30. Prior to listening on the recorded lines, Lt. Gillespie never sought authorization from Chief Carter, any deputy or MBTA legal counsel, he did it on his own.  Id., pages 13-16, 22-23 and 31, deposition of Deputy Murphy, pages 22-23, TAB F

31. Pursuant to MBTA Rules and Regulations Chapter 181 section 6.1:

The Administrative Services Division Commander will keep the tapes in a safe, secure place.

Only the Chief of Police, the Administrative Services Division Commander or his/her designee will have authority to play back recorded conversations.  These recordings will be available ONLY for investigative purposes or when requested by the MBTA Legal Department or court order.  (Emphasis in the original) See Chapter 181, TAB J.

32. Deputy Murphy testified that Lt. Gillespie violated Chapter 181[2] by intercepting these conversations without prior approval.  See deposition of Deputy Murphy, page 25, TAB F

33. Lt. Gillespie's report and testimony indicate that while listening to the recorded 1205 line from February 18, 2004, he overheard two conversations that he believed were inappropriate and damaging to the MBTA Police Department.  See report, TAB L and testimony of Lt. Gillespie at pages 17-18, TAB H.

34. Lt. Gillespie testified that the first two conversations he retrieved from the system were inappropriate. When asked by counsel he gave the following reply:

---

[2] Lt. Gillespie was questioned by counsel regarding his relationship with former MBTA employee Karen Lipensky, he refused to answer any questions.   Ms. Lipensky was charged and convicted of tax evasion following an investigation into the MBTA count room.. Deposition pages 46-49.

Q.    Out of the blue, you pulled these conversations up and they happened to be

inappropriate conversations?

A.    That's right, two of them

Deposition of Lt. Gillespie page 26. TAB H

35.    The first such conversation involved two officers discussing the faxing of a document.

Deputy McCarthy when reviewing the conversation determined that it involved official

union business and not a violation of Department Rules and Regulations.  See March 29,

2004 report TAB K and deposition of Thomas McCarthy pages 24-26, TAB B.

36.    The second conversation intercepted by Lt. Gillespie involved Officer MacKay speaking

with another officer (Flanagan) and referring to Chief Carter as a liar several times.  See

report dated March 29, 2004, TAB K and deposition of Thomas McCarthy pages 27-28.

TAB B

37.    This conversation became the genesis for Deputy McCarthy seeking approval from Chief

Carter to perform an audit of the 1205 line.  Deposition of Thomas McCarthy pages 27-

29 and report dated March 4, 2004, TAB L

38.    The only telephone line that was audited (reviewed) was the 1205 line to the monitor

room during the hours of 3:00 p.m. to 11:30 a.m. (Monday-Friday), the shift that Officer

MacKay worked.  Deposition of Deputy Murphy pages 41-43.  TAB F, Deputy

McCarthy, page 22. TAB B

39.    Deputy McCarthy informed Chief Carter that the reason why Lt. Gillespie was

intercepting the conversations was in connection with a criminal investigation into the

incident with MBTA Police personnel and the State Trooper.  See deposition of Joseph

Carter, pages 17-19, TAB D.

40.    Deputy McCarthy testified that Lt. Gillespie's investigation was administrative in nature and <u>not</u> criminal.  Lt. Gillespie characterized it as a low priority investigation.  <u>See</u> deposition of Deputy McCarthy page 15, TAB B, Lt. Gillespie page 12. TAB H

41.    Officer MacKay's conversation with Officer Flanagan on February 18, 2004[3], occurred the same day that an article appeared in the *Boston Globe* wherein Chief Carter was quoted or misquoted as indicating that his plan to have more officers in and around the Dudley Square station had been bogged down because of union negotiations.  This article was written following a fatal stabbing at the Dudley Square station whereby there was public outcry over the MBTA's policing response in that area.  <u>See</u> *Boston Globe* article, TAB M, deposition of Chief Carter pages 63-72. D

42.    Chief Carter later wrote the *Globe* describing portions of the article as egregiously false. He also sent a memorandum to the department acknowledging the inaccuracies contained in the article and the damaging impact it had on the Department.  <u>See</u> TAB N.

43.    The MBTA Police Union was upset over the *Globe* article and sent a letter to Chief Carter.  <u>See</u> deposition of Chief Carter pages 71-72. TAB D and letter Tab O.

44.    Officer MacKay in his conversation with Officer Flanagan is discussing the *Globe* article and inaccuracies contained therein.  <u>See</u> transcript of telephone call, TAB P and deposition of Robert MacKay pages 42-43, 77-78, defendants' tab A.

45.    Officer MacKay in conversations with other officers including Officer Jordan,

---

[3]The same day that Lt. Gillespie happened to retrieve during his interception of recorded calls.

commented on the MBTA's command staff (including Chief Carter) failure to appear at

homicide and other serious crime scenes as well as overall running of the Department.

The MBTA charged Officer MacKay with referring to Chief Carter as "No Show Joe"

but a review of the transcript from December 17, 2004 reveals that another officer made

that comment.  See transcript TAB Q.


## III.    ARGUMENT

### A.    The Legal Standard

Summary judgment is appropriate if "any pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material facts and that the moving party is entitled to judgment as a

matter of law."  F.R.Civ.P. 56(c).  In fact, the Supreme Court has held:

> ...In our review, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who fails to
> make a showing sufficient to establish the existence of an element essential to that party's
> case and on which that party will bear the burden of proof at trial. Celotex Corp. v.
> Catrett, 477 U.S. 317, 322 (1986).

The First Circuit has  identified what constitutes a genuine issue of material fact:

> To satisfy the criterion of trial worthiness, and thereby forestall summary judgment, an
>
> issue must be "genuine," that is, the evidence relevant to the issue, viewed in the light
>
> most flattering to the party opposing the motion, must be sufficiently open-ended to
>
> permit a rational fact finder to resolve the issue in favor of either side.  National
>
> Amusement, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st. Cir. 1995).

In making its determination, the court must view the evidence in the light most favorable

to the non-moving party and draw all reasonable inferences in its favor.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).

> **B.    The Evidence is Sufficient to Support a Finding that the Defendants Violated the Plaintiffs' First Amendment Rights**

> **1.    The defendants are liable for violating the plaintiffs' First Amendment Rights because a jury could find that their protected speech on a matter of public concern was a motivating factor in an adverse employment action against them.**

A person who undertakes government employment does not relinquish the First Amendment right that he or she would enjoy as a citizen to comment on matters of public interest.  Garcetti v. Ceballos, 126 S.Ct. 1951 (2006)[4]; Pickering v. Board of Ed. of Township High School, Dist. 205, Will Cty., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) citing, Connick v. Meyers, 461 U.S. 138, 140 (1983). When employee speech touches on matters of public concern, Pickering establishes a test intended to balance the competing interests at stake.  Connick, instructs courts to begin by considering whether the expressions in question were made by the speaker "as a citizen upon matters of public concern".  Garcetti v. Ceballos, 126 S.Ct. 1951 (2006); citing Connick.

First, the court must determine whether [the plaintiffs] made their statements as a citizen upon matters of public concern,  Second, the court must weigh the strength of the employee's and the public's First Amendment interests against the government's interest in the efficient

---

[4] The Court has made inquiry regarding the effect if any, the Supreme Court's ruling in Garcetti v. Ceballos, has on the instant action.  In Garcetti, the Supreme Court held that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes and thus are not insulated from employer discipline.  Garcetti v. Ceballos, 126 S.Ct. 1951 (2006).  The defendants have not raised Garcetti's holding in the instant matter most likely because it is undisputed that the plaintiffs' speech was not made in the course of their official duties.

performance of the workplace. Third, if the employee's and the public's First Amendment interests outweigh a legitimate governmental interest in curbing the employee's speech, [the plaintiff] must show that the protected expression was a substantial or motivating factor in an adverse employment action. Mihos v. Swift, 358 F.3d 91, 100 (1st Cir. 2004); Mullin v. Town of Fairhaven, 284 F.3d 31, 37-38 (1st Cir. 2002); Tang v. State of R.I., Dept. of Elderly Affairs, 163 F.3d 7, 12 (1st Cir.1998) (citations omitted); Parrow v. Kinnon, 300 F.Supp. 2d 256 (D.Mass. 2004). The public interest qualification is important. The Pickering test is triggered only when the employee speaks ""as a citizen upon matters of public concern,"" rather than ""as an employee upon matters only of personal interest."" Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).   The mere fact that an public employee expresses his views inside the office rather than publicly, is not dispositive.  Garcetti v. Ceballos, 126 S.Ct. 1951 (2006).  Employees may receive First Amendment protection for expressions made at work. Garcetti v. Ceballos, 126 S.Ct. 1951 (2006); citing, Givan v. Western Line Consol School Dist., 439 U.S. 410 (1979).

    The speech at issue here, consists of the plaintiffs' protests over the Chief of Police's misrepresentations to the media regarding a shooting at the Dudley Square, the MBTA's policing methods regarding recent crimes committed at the Dudley MBTA station, and Chief Carter's management style and purported absenteeism.

### 2.    Plaintiffs' speech involved a matter of public concern.

    Greater constitutional protection is afforded to speech on matters of public concern than speech limited to private matters or the internal operations of government.  Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).   The first step in determining

whether the speech touches on a matter of public concern is based on the "content, form, and context of a given statement as revealed by the whole record". Jordan v. Carter, 428 F.3d 67 (1st Cir. 2005); Connick v. Myers, 461 U.S. 138, 147-48 (1983). This Court has stated further that "Where a public employee speaks out on a topic which is clearly a legitimate matter of inherent concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the 'form and context' of the expression." O'Conner v. Steeves, 994 F.2d 905, 913-14 (1st Cir. 1993). If only personal speech is involved, "then its First Amendment value is low and a federal court is not the appropriate forum in which to review the wisdom of internal decisions arising therefrom" Jordan v. Carter, 428 F.3d 67 (1st Cir. 2005); Connick v. Myers, 461 U.S. 138, 147-48 (1983).

The court Jordan v. Carter, 428 F.3d 67 (1st Cir. 2005)[5] in reviewing the bare allegations in the instant complaint could not "reject the possibility that at least some of the speech would fall within an area of public concern." Jordan 428 F.3d at 71. The Court went further by stating "criticism of the chief and other management, as well as expressions of concern about safety at one of the MBTA passenger stations could-depending upon the particulars of content, form and context-constitute a matter of legitimate public concern." Id. Now after discovery, there should be no question that the plaintiffs' speech in part, touched on matters of public concern. The plaintiffs' speech, even has characterized by the defendants in their motion for summary judgment (pages 13-17) touches on matters of public concern. The defendants merely focus on

_____

[5] The First Circuit's opinion was generated by the defendants' interlocutory appeal of the denial by this Court of their motion for judgment of the pleadings on the grounds of qualified immunity.

the content of the speech without examining the context[6] in which such speech occurred.  During

the time the plaintiffs were discussing the incident at the Dudley Square MBTA station, a

stabbing had occurred where a young male was killed.  There was a public outcry concerning

safety and police responsiveness in that area.  Chief Carter in an apparent attempt to shield

himself from public criticism, suggested to a reporter from the <u>Boston Globe</u>, in essence, that

had his patrol plan been put in place, this type of violence could have been avoided.  Chief

Carter further suggested that it was the MBTA police patrolmen's union that had thwarted his

patrol plan.  Chief Carter later demanded a retraction from the editor of the <u>Globe</u> explaining that

he had been "misquoted".  Officer MacKay and Jordan's discussion on the recorded line with

respect to the Dudley Square incident was made in this context.  The plaintiffs' further

statements concerning the high levels of absenteeism by Chief Carter, the mis-management of

the MBTA Police Department and safety issues concerning the MBTA Dudley station, were not

internal grievances or based on personal animosity.  <u>See</u> <u>Meaney v. Dever</u>, 326 F.3d 283 (1st Cir.

2003); <u>but</u> <u>see</u>  <u>Wagner v. City of Holyoke</u>, 241 F.Supp. 2d 78 (D.Mass. 2003) (plaintiff who

personally dislikes or bears a grudge against a particular individual does not necessarily lose his

right to make statements regarding that individual that raise matters of public concern, even if his

motive in making the statements derives partially or completely from personal animus).  The

plaintiffs' statements about the management (or lack thereof) of the MBTA police department

came at a time when the MBTA police department was under intense scrutiny by the media and

public at large due to the spike of violence at train stations, sub-stations and on the vehicles

---

[6]The transcript of Officer MacKay and Jordan's discussion regarding this issue can be
found at defendants' tabs H and I.

themselves.  The plaintiffs' comments were manifestly directed to matters of public concern.

Indeed, statements concerning lack of management response to the rise in crime, staffing levels

and the Chief's own work history within the department are precisely the type of

communications that demand strong First Amendment protection.  As the Supreme Court noted,

speech on public issues is the "essence of self-government" and "occupies the highest rung of

hierarchy of First Amendment values".  <u>Connick v. Meyers</u>, 461 U.S. 138, 145 (1983).  Their

statements were not mere personal complaints about working conditions.  <u>Tang v. State of R.I.,

Dept. of Elderly Affairs</u>, 163 F.3d 7, 12 (1st Cir.1998).

> **3.      The public's interest in learning about mismanagement, absenteeism,
> and safety issues at the MBTA and MBTA Police Department far
> outweigh any interest of the government in limiting the plaintiffs'
> speech.**

If the speech at issue pertains to matters of pubic concern, the court must balance the

strength of plaintiffs' and the public's First Amendment interests against the "interest of the

State as an employer, in promoting the efficiency of the public services it performs through its

employees. <u>Jordan v. Carter</u>, 428 F.3d 67 (1st Cir. 2005); <u>O'Conner v. Steeves</u>, 994 F.2d 905,

913-14 (1st Cir. 1993) <u>citing</u> <u>Pickering v. Board of Ed. of Township High School, Dist. 205, Will

Cty.</u>, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).  Interests in communicating

safety concerns and performance criticism have been deemed of public concern as well as the

interests of the public in receiving such information.  <u>Mihos v. Swift</u>, 358 F.3d 91, 100 (1st Cir.

2004);  <u>Jordan v. Carter</u>, 428 F.3d 67 (1st Cir. 2005).

While courts have acknowledged that there is a heightened interest in maintaining

discipline and harmony among employees.  <u>Moore v. Wyneewood</u>, 57 F.3d 924 (10th Cir. 1995);

<u>Kokkins v. Ivkovich</u>, 185 F.3d 840, 845 (7th Cir. 1999).  Motivation is an important factor for

courts to consider.  As the Court in <u>Jordan</u>  indicated, "if the allegations of the complaint tell us

that appellant (Chief Carter) retaliated because of plaintiffs criticism of his and his deputies' job

performance.  If appellant did so entirely out of self interest to silence legitimate criticism, the

government interest would be weakened."  <u>Jordan v. Carter</u>, 428 F.3d 67 (1st Cir. 2005).  Further,

absent any evidence showing disruption of police department functioning, governmental interest

would be weakened as well.  <u>Wagner v. City of Holyoke</u>, 241 F.Supp. 2d 78 (D.Mass. 2003);

<u>Putnam v. Town of Saugus</u>, 365 F.Supp. 2d 151 (D.Mass. 2005); <u>Parrow v. Kinnon</u>, 300 F.Supp.

2d 256 (D.Mass. 2004).

      Here, there are disputed issues of fact as to the motivation behind Chief Carter's decision

to terminate the plaintiffs.  There is ample evidence of personal animosity against the plaintiffs

and self interest in silencing criticism of his management style.  For example, other officers who

were charged with similar misconduct ie. violation of CORI and disrespectful conduct did not

receive suspensions let alone charged criminally.  Yet, MacKay and Jordan were not only

terminated but had criminal charges taken out against them by the department.   In the entire

history of the MBTA police department the SOT team has never been activated and ordered to

act as security when officers are relieved from duty.  Yet, when MacKay and Jordan were

relieved of duty, Chief Carter activated the SOT team and had them stand in the corridor leading

to his office.  Further, it is of no coincidence that the criminal charges were filed against the

plaintiffs on the day after that the plaintiffs filed the instant action.

      Lt. Gillespie's explanation regarding his "mistake" regarding his interception of recorded

calls is laughable in the face of evidence that he specifically targeted February 18, 2004 to listen

in on conversations.  Not for any legitimate investigatory purpose but, to eavesdrop on officers

who were clearly upset over Chief Carter's interview with the *Boston Globe* which appeared that very same day.  It is of no coincidence that Lt. Gillespie stumbled upon Officer MacKay's conversation with another officer regarding the *Globe* article.  Given the fact that Lt. Gillespie never found any conversations relating to the purported investigation further illustrates pre-textual nature of the MBTA's claims.

Moreover, interests in communicating safety concerns and performance criticism in this case and the interests of the public in receiving such information outweigh the MBTA's interests in promoting the efficiency of the public services it performs through its employees.  In fact, the defendants have offered no evidence that the plaintiffs' statements caused any disruption in police department functioning.

The Pickering balancing test tilts heavily in favor of the plaintiffs.

### 4.     A jury could find that the plaintiffs' speech was a motivating factor in the defendants' adverse employment actions

The third stage of the First Amendment determination in the public employment context is that the employee must show that his/her protected activity was a substantial or motivating factor in the adverse employment action.   Mihos v. Swift, 358 F.3d 91, 100 (1st Cir. 2004).  Once a plaintiff has made this showing the burden shifts to the employer to show by a preponderance of the evidence that it would have reached the same conclusion even in the absence of the protected  speech.  Vazquez-Valentin v. Santiago-Diaz, 385 F.3d 23, 30 (1st Cir. 2004).   The plaintiffs do not have to produce probative evidence that that the protected activity was a "but for" cause of the adverse employment action. Id.   If the evidence supports an inference that the defendants were, at least, in part, motivated by the plaintiffs' protected speech,

-16-

then summary judgment should be denied.

It is axiomatic that on summary judgment, the Court must "construe the record and all reasonable inferences from it in favor of the non-movant." Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001). The Court should view "the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences on that part's favor. Kearney v. J.P. King Auction Co., 265 F.3d 27, 34 (1st Cir. 2001). Further, this Court should act cautiously when the factual question at issue at summary judgment requires "the always difficult question of probing the wellsprings of human motivation." Carey v. Mt. Desert Island Hosp., 156 F.3d 31, 24 (1st Cir. 1998).

The instant case is precisely the kind of case where a jury, rather than a judge should determine what was going through the minds of the defendants. "Juries are the great leveling and democratizing element in the law. They give its authority and generalized acceptance in ways that imposing buildings and sonorous openings cannot hope to match. Every step away from juries is a step which ultimately weakens the judiciary as the third branch of government." Radford Trust v. First UNUM Life Ins.Co.of Am, 321 F.Supp 3d 226, 241 (D.Mass. 2004).

Viewed in this light, inferences supportive of the plaintiffs' position are reasonably available from the evidence. At least for purposes of summary judgment, the availability of these inferences is conclusive. The issue at this stage is neither probability nor the weight of the evidence. Simply put, since a reasonable jury could draw inferences from the evidence suggested by the plaintiffs, then the defendants' motion must be denied.

## C.    CHIEF CARTER IS NOT ENTITLED TO QUALIFIED IMMUNITY

As the First Circuit has stated "[G]overnment officials performing discretionary functions

generally are shielded from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   Mihos v. Swift, 358 F.3d 91, 100 (1st Cir. 2004); quoting  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The First Circuit also employs a three part test when determining if a public employee is entitled to qualified immunity: (1) whether the plaintiff's allegations if true, establish a constitutional violation; (2) whether the right was clearly established at the time of the alleged violation; (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue.  Jordan v. Carter, 428 F.3d 67 (1st Cir. 2005); Mihos v. Swift, 358 F.3d 91, 102 (1st Cir. 2004);  Suboh v. District Attorney's Office of Suffolk Dist., 298 F.3d 81, 90 (1st Cir. 2002).

Additionally, because qualified immunity is an affirmative defense, the burden of proof in this fact based reasonableness inquiry is on the defendant.  Dimarco-Zappa v. Cabanillas, 238 F.3d 25, 35 (1st Cir. 2001).

As noted in section B. above, the plaintiffs have shown that they have established a constitutional claim against the defendants.  The next inquiry should be whether or not that right was clearly established.

In analyzing whether a constitutional right has been clearly established, it is not necessary for the particular violation in question to have been previously held unlawful. Anderson v. Creighton, 483 U.S. 635, 640 (1987); see also Mitchell v. Forsyth, 472 U.S. 511, 535 n.12 (1985) (holding that clearly established right does not require judicial precedent to that effect).  Instead, a clearly established right exists in the absence of precedent where "the contours of the right [are] sufficiently clear that a reasonable official would understand that what

he is doing violates that right." <u>Anderson</u> 483 U.S. at 640; <u>Wilson v. Layne</u>, 526 U.S. 603, 614-15 (1999). To that extent, government officials are considered "on notice" that conduct is violative of established law if the state of the law at the time gave them "fair warning" that their conduct would be unconstitutional. <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002). It has been long established that public employees are free to speak out on matters of public concern and that retaliation for such actions can lead to violations of their First Amendment. <u>See</u> <u>generally</u>, <u>Connick v. Myers</u>, 461 U.S. 138, 147-48 (1983); <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968); <u>Thomas v. Carpenter</u>, 881 F. 2d 828 (9th Cir. 1989) (speech regarding competency of law enforcement agency is a matter of public concern). Chief Carter cannot reasonably say that the rights of the plaintiffs to speak out on matters of public concern was not clearly established at the time he initiated disciplinary action against them. Chief Carter again urges the Court to award him immunity based on the same generic argument raised before this Court and the First Circuit that is, only in the extraordinary case will it have been clearly established that a public employee's speech merited constitutional protection. Chief Carter cites <u>Dirrane v. Brookline Police Dept.</u>, 315 F.3d 65 (1st Cir. 2002) and <u>Wagner v. City of Holyoke</u>, 404 F.3d 504 (1st Cir. 2005) for the proposition disciplinary conduct imposed for a mixture of protected and unprotected speech ie. a "morass of complaints" would entitle the state actor to qualified immunity because of the broad range of complaints permitting a reasonable belief that discipline was permissible. As the First Circuit in this case pointed out: "if plaintiffs' criticism consisted of serious expressions of concern, voiced in an appropriate manner, about the effect of their supervisors' poor performance on public safety or other public matters and appellant's retaliation was primarily aimed at silencing their criticism for his own advantage, precedent would have

clearly established that the balance of interests tipped decisively in plaintiffs' favor." Jordan v. Carter, 428 F.3d 67, 76 (1st Cir. 2005). Moreover, as the Court said in Mihos, (denying former Governor Swift's claim of qualified immunity) "If Swift fired Mihos because she was concerned that the tangible results of his vote would negatively affect the efficient functioning of government services and the financial standing of the Turnpike Authority, she would have weighty interests on her side of the *Pickering* scale. On the other hand, if Swift fired Mihos in a retaliatory fit of pique because she disagreed with his vote and wished to punish him, she would have no legitimate governmental interests on her side of the scale. Indeed, Swift's true motivation for firing Mihos for his vote is a core issue in this case." Id.

In balancing the interests in the present case, the scale clearly weighs in favor of the plaintiffs. If Chief Carter[7] disciplined the plaintiffs in retaliation for engaging in constitutionally protected speech, he would not be protected by qualified immunity. Clearly, this is what at issue here, the plaintiffs contend and have shown evidence that Chief Carter retaliated against them primarily in an effort to silence their criticism regarding he and his subordinates mismanagement concerning public safety issues, response and actions concerning safety issues at the Dudley Square T station and excessive absenteeism from his post as Chief of Police. The plaintiffs have presented sufficient evidence that tips the scale in their favor that their right to speak out on such conduct was clearly established and punishment for such conduct would an unreasonable and impermissible.

Again the key question at this juncture is what the defendants' motivations were in

---

[7]. If the parties motivation remains disputed, a jury would have to resolve the disputed facts. Johnson v. Jones, 515 U.S. 304 (1995).

imposing discipline on the plaintiffs.  Just as in <u>Mihos</u>, <u>supra</u> "the defendants true motivation for firing [plaintiff] for his [speech] is a core issue in this case."  358 F.3d at 103.  If as the plaintiffs here suggest, the evidence is sufficient for a jury to infer that plaintiffs' constitutionally protected speech was as substantial factor in the defendants' decisions, then such conduct would violate clearly established law.

The last step in the qualified immunity analysis requires courts to examine "whether an objectively reasonable officer in the defendant's position would have understood that [his] action to violate the plaintiff's rights."  <u>Suboh v. District Attorney's Office of Suffolk Dist.</u>, 298 F.3d 81, 90 (1st Cir. 2002).  Again, taking the allegations in the light most favorable to the plaintiffs, no reasonable official could have failed to realize that the plaintiffs could not have been disciplined for speaking out on matters of public concern.

## IV.    CONCLUSION

For the above cited reasons, the defendants's motion for summary judgment should be denied.


The Plaintiffs, Ronald Jordan and Robert Mackay,
By their attorneys,


/S/ James W. Simpson, Jr,.
James W. Simpson, Jr.,
Merrick, Louison & Costello, LLP.
67 Batterymarch Street
Boston, MA 02110
(617) 439-0305

Dated:  February 2, 2007

**Certificate of Service**

I, James W. Simpson, Jr., do certify that on the 2nd Day of February 2007, I served the foregoing on counsel for the defendants.

/S/ James W. Simpson, Jr.,