UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CA NO. 04-10927-RGS

RONALD JORDAN, ROBERT MACKAY,
    Plaintiffs,

v.

JOSEPH C. CARTER, Individually and as Chief of the MBTA Police Department, and MBTA POLICE DEPARTMENT,
    Defendants.

### PLAINTIFFS' LOCAL RULE 56.1 RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND STATEMENT OF MATERIAL FACTS TO WHICH THERE IS A GENUINE DISPUTE

Pursuant to L.R. 56.1, the plaintiffs hereby submit following in response to the defendants' statement of undisputed facts and submit the following material facts to which there is a genuine dispute.

**I.**     **Response to Defendants' Statement of Undisputed Facts:**

1.     Admitted/undisputed.

2.     Admitted insofar that there was a public perception that the MBTA Police Department ("Department") was engaging in such conduct. Denied as to the truth of the matters asserted therein.

3.     Denied as stated, Officers Jordan and MacKay's testimony has been taken out of context. Officer MacKay testified to the following:

    Q.     What did you understand the connection to be between the task force and Joe Carter being hired?

    A.     Other than most of the task force members that I believe—or that I knew-were

        black, and they were looking for a black chief to ease the tension in the community, which is what the rumors were. MacKay deposition pages 37-38. TAB A.

4. Admitted that Chief Carter testified to said plan, but denied as to whether said plan of action was implemented as stated.

5. Denied as to who was listening to tapes of recorded conversations on February 24, 2004. Lt. Gillespie testified that he began to listen to tapes on February 24, 2004. Deputy McCarthy testified that Lt. Gillespie informed him that two detectives (Valente and Mui) were listening in on the recorded line (1205 Line) on February 24, 2004. McCarthy Deposition pages 13-15, Tab "B".

6. Denied, see response to paragraph #5 above.

7. Admitted as to what Lt. Gillespie's testimony was as to why he listened to the wrong dates. Denied as to the truth of the matter asserted in said testimony.

8. Admitted as to what Lt. Gillespie's testimony was concerning his belief regarding possible departmental violations. Denied as to the truth of the matter asserted in said testimony.

9. Admitted/undisputed.

10. Admitted/undisputed.

11. Admitted insofar that Deputy McCarthy testified that Lt. Gillespie reported the conversations to him orally rather than in writing.

12. Admitted insofar as to the testimony of Deputy McCarthy and Chief Carter concerning authorization to investigate the taped conversations on the 1205 line.

13. Admitted/undisputed.

14. Admitted/undisputed.

15. Admitted/undisputed.

16. Admitted that Officer Jordan was charged with violation of CORI but, disputed as to whether or not the alleged violations "primarily concerned" his CORI inquiry.

17. Admitted/undisputed.

18. Admitted/undisputed, the transcripts of the conversations speak for themselves.

19. Admitted/undisputed.

20. Admitted/undisputed.

21. Admitted/undisputed, the transcripts of the conversations speak for themselves.

22. Admitted/undisputed, the transcripts of the conversations speak for themselves.

23. Admitted/undisputed.

24. Admitted that the transcripts of the recorded conversations contain such statements, but denied and disputed as to the defendants' characterization as to what each statement refers to. For example, Officer MacKay was asked regarding the comment "fucking foolishness". His response was "I don't know, it could be anything. I know he wanted to change the vacation times so you couldn't take a day here and a day there." MacKay deposition page 69. TAB A

25. Admitted that the transcripts of the recorded conversations contain such statements, but denied and disputed as to the defendants' characterization as to what each statement refers to.

26. Admitted that the transcripts of the recorded conversations contain such statements, but

      denied and disputed as to the defendants' characterization as to what each statement refers to.

27. Admitted/undisputed.

28. Admitted that the transcripts of the recorded conversations contain such statements, but denied and disputed as to the defendants' characterization as to what each statement refers to.

29. Admitted/undisputed.

30. Admitted/undisputed.

31. Admitted/undisputed.

32. Admitted/undisputed.

33. Admitted that following a hearing an MBTA retained hearing officer found just cause to terminate Officers Jordan and MacKay.

34. Admitted/undisputed.

35. Admitted/undisputed.

36. Denied/disputed. Officer MacKay never testified to the statements attributed to him in paragraph 36. See deposition of Officer Mackay, pages 32-33. TAB A

37. Denied as characterized by the defendants. Officer Jordan's testimony found in the cited pages speaks for itself.

## II. PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN WHICH THERE IS NO DISPUTE

1. Robert MacKay was appointed to the MBTA Police Department in 1992. Previously, he was employed by the Town of Reading as a police officer. See MacKay deposition pages 8-9, Tab A.

2. Officer MacKay as assigned to the monitor room at the MBTA Police station around 1996-1997. MacKay deposition page 10. TAB A

3. MacKay was elected as vice-president of the Union (MBTA Police Association) in 1996. MacKay deposition page 11. Id.

4. He served in that position until 1999 and then was re-elected in 2005. MacKay deposition page 15. TAB A

5. MacKay's shift while working in the monitor room was Monday-Friday, 3:00 p.m.-11:30 p.m. MacKay deposition page 16. TAB A

6. Part of his responsibilities in the monitor room was to answer several different phone lines which the public could call in as well as MBTA police personnel. The "1205" line was not a public line but was only accessed after cycling through other lines that were no answered. MacKay deposition pages 13-18. TAB A.

7. MacKay would also run registry checks and warrant inquires for police personnel who called in via the 1205 line for such information. MacKay deposition pages 17-20. TAB A

8. Prior to his termination by the MBTA in April 2004, Officer MacKay had never been the subject of disciplinary proceedings in connection with his employment with the MBTA Police Department. MacKay deposition page 60. TAB A

9. Officer Ronald Jordan was appointed to the MBTA Police Department in 1989. He left the department in the early nineties to work for the Braintree Police Department and then returned to the MBTA Police Department. Ronald Jordan deposition pages 6-8, TAB C.

10. Jordan worked in the patrol division usually during the 6:00 p.m. to 2:00 a.m. shift.

        Jordan deposition, pages 10-11. TAB C

11. In February 2004, during the relevant period, Officer Jordan was out of work through the MBTA's EAP program attending counseling for an substance abuse problem. Jordan deposition pages 12-13. TAB C

12. Prior to his termination, Jordan had incurred a 3 day suspension for supposed discourtesy towards a civilian during a traffic stop. TAB C

13. In March 2004, Officers Jordan and MacKay were summonsed to the MBTA Police Station where they were relieved of duty by Chief Carter and notified of the charges against them. Chief Carter ordered the activation of the MBTA's "SOT" team (Special Operations) to stand guard in the hallway outside Chief Carter's office. This was the first time and only time since that the SOT had been activated for that purpose. See Chief Carter's deposition pages 54-56, TAB D, Jordan deposition page 62, MacKay deposition page 52. TABS A AND C

14. In April 2004, following a hearing before Kevin McDermott, Assistant General Counsel for the MBTA, Officers Jordan and MacKay were terminated from employment with the MBTA Police Department.

15. On May 11, 2004, Deputy Dolores Ford-Murphy of the MBTA Police Department swore out criminal complaints at the Roxbury District Court. against Officers Jordan and MacKay for alleged violations of CORI (G.L. c. 6 Section 178). See application for complaints, TAB E

16. This was the first and only time to date that the MBTA Police Department had sought criminal complaints against one of its own employees. See deposition of Thomas

McCarthy, page 52, TAB B, Deputy Murphy, page 33-34, TAB F

17. The plaintiffs filed the instant action with this court on May 10, 2004. See instant docket.

18. On November 15, 2003, Officer Brian Harer, was given an informal counseling for harassing a citizen during a motor vehicle stop and after receiving word of the citizen's complaint, running a BOP (Board of Probation) check on the complainant without proper authorization. See November 13, 2003, notice from Chief Carter. TAB G.

19. Officer Harer was not terminated from employment nor were criminal charges brought against him. Deposition of Chief Carter, Page 76. TAB D

20. Deputy Murphy was "surprised" that Officers Jordan and MacKay were terminated because it was more harsh than previous discipline that she was familiar with. See deposition of Deputy Murphy, page 51 TAB F.

21. Lt. Mark Gillespie has run warrant checks, license checks for friends who requested the information. See deposition of Lt. Gillespie pages 39-40. TAB H

22. Not all officers who, during the audit of the 1205 line, who violated departmental rules and regulations or standards of conduct were subject to disciplinary action by the MBTA. See deposition of Deputy Murphy, page 59-61, TAB F, Deputy Thomas McCarthy, page 66. TAB B.

23. Officers Jordan and MacKay filed grievances over their termination which were carried forward to arbitration wherein arbitrators overturned their terminations and imposed a one day and five day suspension.

24. Officers Jordan and MacKay were found not guilty of all criminal charges following a

bench trial before the Roxbury District Court.

### III. PLAINTIFFS' STATEMENT OF MATERIAL FACTS TO WHICH THERE IS A GENUINE DISPUTE

1. On February 24, 2004, Lt. Gillespie of MBTA claimed that in connection with an investigation into an incident involving MBTA police personnel and a state trooper, he began to listen to recorded conversations from the 1205 line. The incident in question occurred on February 10, 2004. See report dated March 24, 2004, TAB I and deposition of Lt. Gillespie, pages 9-13, TAB H.

2. Lt. Gillespie however, informed Deputy Thomas McCarthy that it was two detectives (Mui and Valente) who were listening to recorded lines. McCarthy Deposition pages 13-15, Tab "B".

3. Lt. Gillespie testified that he listened to recorded conversations from February 18, 2004, despite the fact that the incident which was the subject matter of the investigation occurred on February 10, 2004. See report dated March 24, 2004, TAB I and deposition testimony of Lt. Gillespie pages 17-20. TAB H

4. Lt. Gillespie claimed that he did not know how to use the playback machine and that is why he listened to the wrong date. This is despite his understanding that in order to playback a specific date and time, you have to enter it into the system. Id at page 19. Lt. Gillespie never informed Deputy McCarthy that he made a mistake when attempting to access recorded conversations from February 10, 2004[1]. See deposition of Thomas

---

[1] Curiously, Lt. Gillespie was unable to retrieve any conversations from February 10, 2004 relative to his purported investigation into the incident involving MBTA Police Detectives

      McCarthy page 19. TAB B

5.     Lt. Gillespie continued to listen to recorded conversations on February 18, 2004, knowing full well that he had made mistake and had the wrong date. Id., at 20-21. TAB H

6.     Prior to listening on the recorded lines, Lt. Gillespie never sought authorization from Chief Carter, any deputy or MBTA legal counsel, he did it on his own. Id., pages 13-16, 22-23 and 31, deposition of Deputy Murphy, pages 22-23, TAB F

7.     Pursuant to MBTA Rules and Regulations Chapter 181 section 6.1:

The Administrative Services Division Commander will keep the tapes in a safe, secure place.
Only the Chief of Police, the Administrative Services Division Commander or his/her designee will have authority to play back recorded conversations.  These recordings will be available ONLY for investigative purposes or when requested by the MBTA Legal Department or court order. (Emphasis in the original) See Chapter 181, TAB J.

8.     Deputy Murphy testified that Lt. Gillespie violated Chapter 181[2] by intercepting these conversations without prior approval. See deposition of Deputy Murphy, page 25, TAB F

9.     Lt. Gillespie's report and testimony indicate that while listening to the recorded 1205 line from February 18, 2004, he overheard two conversations that he believed were inappropriate and damaging to the MBTA Police Department. See report, TAB L and testimony of Lt. Gillespie at pages 17-18, TAB H.

---

and a state trooper. Lt. Gillespie deposition pages 44-45.

    [2] Lt. Gillespie was questioned by counsel regarding his relationship with former MBTA employee Karen Lipensky, he refused to answer any questions.  Ms. Lipensky was charged and convicted of stealing money from the count room at the MBTA.  Deposition pages 46-49.

10. Lt. Gillespie testified that the first two conversations he retrieved from the system were inappropriate. When asked by counsel he gave the following reply:

    Q. Out of the blue, you pulled these conversations up and they happened to be inappropriate conversations?

    A. That's right, two of them

Deposition of Lt. Gillespie page 26. TAB H

11. The first such conversation involved two officers discussing the faxing of a document. Deputy McCarthy when reviewing the conversation determined that it involved official union business and not a violation of Department Rules and Regulations. See March 29, 2004 report TAB K and deposition of Thomas McCarthy pages 24-26, TAB B.

12. The second conversation intercepted by Lt. Gillespie involved Officer MacKay speaking with another officer (Flanagan) and referring to Chief Carter as a liar several times. See report dated March 29, 2004, TAB K and deposition of Thomas McCarthy pages 27-28. TAB B

13. This conversation became the genesis for Deputy McCarthy seeking approval from Chief Carter to perform an audit of the 1205 line. Deposition of Thomas McCarthy pages 27-29 and report dated March 4, 2004, TAB L

14. The only telephone line that was audited (reviewed) was the 1205 line to the monitor room during the hours of 3:00 p.m. to 11:30 a.m. (Monday-Friday), the shift that Officer MacKay worked. Deposition of Deputy Murphy pages 41-43. TAB F, Deputy McCarthy, page 22. TAB B

15. Deputy McCarthy informed Chief Carter that the reason why Lt. Gillespie was

        intercepting the conversations was in connection with a criminal investigation into the incident with MBTA Police personnel and the State Trooper. <u>See</u> deposition of Joseph Carter, pages 17-19, TAB D.

16. Deputy McCarthy testified that Lt. Gillespie's investigation was administrative in nature and <u>not</u> criminal. Lt. Gillespie characterized it as a low priority investigation. <u>See</u> deposition of Deputy McCarthy page 15, TAB B, Lt. Gillespie page 12. TAB H

17. Officer MacKay's conversation with Officer Flanagan on February 18, 2004[3], occurred the same day that an article appeared in the *Boston Globe* wherein Chief Carter was quoted or misquoted as indicating that his plan to have more officers in and around the Dudley Square station had been bogged down because of union negotiations. This article was written following a fatal stabbing at the Dudley Square station whereby there was public outcry over the MBTA's policing response in that area. <u>See</u> *Boston Globe* article, TAB M, deposition of Chief Carter pages 63-72. D

18. Chief Carter later wrote the *Globe* describing portions of the article as egregiously false. He also sent a memorandum to the department acknowledging the inaccuracies contained in the article and the damaging impact it had on the Department. <u>See</u> TAB N.

19. The MBTA Police Union was upset over the *Globe* article and sent a letter to Chief Carter. <u>See</u> deposition of Chief Carter pages 71-72. TAB D and letter Tab O.

20. Officer MacKay in his conversation with Officer Flanagan is discussing the *Globe* article and inaccuracies contained therein. <u>See</u> transcript of telephone call, TAB P and

---

[3]The same day that Lt. Gillespie happened to retrieve during his interception of recorded calls.

deposition of Robert MacKay pages 42-43, 77-78, defendants' tab A.

21. Officer MacKay in conversations with other officers including Officer Jordan, commented on the MBTA's command staff (including Chief Carter) failure to appear at homicide and other serious crime scenes as well as overall running of the Department. The MBTA charged Officer MacKay with referring to Chief Carter as "No Show Joe" but a review of the transcript from December 17, 2004 reveals that another officer made that comment. See transcript TAB Q.

22. Chief Carter's decision to terminate the plaintiffs was motivated by his desire to silence critical discussion regarding matters of public concern and his overall management style as it related to the day to day operations of the MBTA Police Department.

23. The MBTA Police Department's purported investigation and interception of recorded calls on the 1205 line was merely a pretext for a concerted effort on the part of the defendants to silence employees who were speaking out on matters of public concern.

The Plaintiffs, Ronald Jordan and Robert Mackay,
By their attorneys,

/S/ James W. Simpson, Jr,.
James W. Simpson, Jr.,
Merrick, Louison & Costello, LLP.
67 Batterymarch Street
Boston, MA 02110
(617) 439-0305

Dated:  February 1, 2007