UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10927-RGS

RONALD JORDAN

and

ROBERT MACKAY

v.

JOSEPH C. CARTER, Individually and in his capacity as
Chief of the MBTA Police Department

and

THE MBTA POLICE DEPARTMENT

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

July 6, 2007

STEARNS, D.J.

On May 10, 2004, plaintiffs Ronald Jordan (Jordan) and Robert MacKay (MacKay) filed a seven count complaint against the MBTA Police Department (Department) and its Chief, Joseph Carter (Carter).[1]  Several of plaintiffs' claims have been dismissed.  The sole

---

[1] Plaintiffs alleged violations of their state and federal constitutional rights to due process (Counts I and II); freedom of speech (Counts III and IV); and freedom of association (Counts V and VI).  In addition, plaintiffs asserted a claim for intentional infliction of emotional distress (Count VII).  On November 3, 2004, the defendants filed a motion for judgment on the pleadings.  A hearing was held on January 14, 2005.  At the hearing, plaintiffs waived their due process claims.  In an oral ruling from the bench, the court dismissed the freedom of association claims and the claim for intentional infliction of emotional distress.  Finally, the court denied Chief Carter's claim of qualified immunity as premature.  On February 1, 2005, Carter filed an interlocutory appeal of the denial of qualified immunity.  On November 4, 2005, the First Circuit affirmed this court's ruling. See Jordan v. Carter, 428 F.3d 67, 75 (1st Cir. 2005).

remaining issue in the case is whether plaintiffs' First Amendment rights were violated when they were disciplined for comments made on the Department's recorded telephone line. On December 15, 2006, defendants filed a motion for summary judgment. A hearing on the motion was held on April 19, 2007.

## BACKGROUND

Jordan and MacKay were Department patrolmen. During the relevant time period, MacKay was assigned to the Monitor Room, where his primary responsibility was answering emergency calls. In connection with this assignment, MacKay was authorized to conduct computer searches of outstanding warrants, probation records, and Registry of Motor Vehicles (RMV) information. In April of 2004, Jordan and MacKay were terminated for violating the Massachusetts' Criminal Offender Records Information (CORI) statute, G. L. c. 6, § 172, and for making obscene and inappropriate comments over the Department's telephone line.[2] Plaintiffs allege that they were disciplined primarily because

---

[2]In February of 2004, Lieutenant Detective Mark Gillespie (Gillespie) listened to tapes of recorded telephone conversations among MBTA police officers. Gillespie overheard conversations between MacKay and other officers that he believed were in violation of Department regulations. He reported the conversations to Deputy Chief Thomas McCarthy (McCarthy). McCarthy consulted with Chief Carter, who authorized an investigation. The parties dispute the propriety of Gillespie's monitoring of the tapes. Gillespie claims that he listened to the tapes as part of an investigation into a February 10, 2004 altercation between two officers under his command and a state trooper. Plaintiffs suggest a more sinister motive. Gillespie testified that he was unfamiliar with the software for reviewing the tapes, and inadvertently called up conversations taped on February 18, 2004. Plaintiffs argue that Gillespie knew that he had to enter the specific date of a desired conversation. The date of the overheard conversations, February 18, 2004, was the date on which a controversial article involving Chief Carter appeared in the local press. Discussion of the article figured prominently in plaintiffs' overheard conversations.

of their criticism of the performance of Chief Carter and his deputies.[3] Plaintiffs categorize the subject matter of their speech into three putatively protected categories: (1) their protest over misrepresentations that Chief Carter allegedly made to the media about a shooting at the Dudley Square MBTA station; (2) public safety concerns; and (3) Carter's management style and purported absenteeism.

## APPLICABLE LAW

The First Amendment protects a public employee's right, in prescribed circumstances, to speak as a citizen addressing matters of public concern. Connick v. Myers, 461 U.S. 138, 147 (1983). A three-part test is utilized to determine whether a plaintiff has an actionable First Amendment claim. Plaintiffs must show: (1) that their expression involved matters of public concern; (2) that their interest [and the public's interest] in commenting upon those matters outweighed the Department's interest in promoting workplace efficiency; and (3) that their "protected speech" was a substantial or motivating factor in the Department's disciplinary decision. Lewis v. City of Boston, 321 F.3d 207, 218 (1st Cir. 2003). The first two factors involve questions of law for the court's determination. Connick, 461 U.S. at 148 n.7. If plaintiffs meet their burden, defendants can avoid liability only if they show by a preponderance of the evidence that they would have reached the same decision even had the protected conduct never occurred. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

---

[3]After arbitration, Jordan's punishment was reduced to a one-day suspension. MacKay's punishment was reduced to a five-day suspension. On May 11, 2004, one day after plaintiffs filed this action, Deputy Delores Ford-Murphy of the Department swore out criminal complaints against plaintiffs for violations of the CORI statute, G.L. c. 6, § 178. Following a bench trial in the Roxbury District Court, plaintiffs were found not guilty.

1. Public Concern

The First Amendment protects speech by a public employee "only when the employee speaks as a citizen upon matters of public concern rather than as an employee upon matters only of personal interest." City of San Diego v. Roe, 543 U.S. 77, 83 (2004). "[T]he greater the value of the subject of the speech to the public, the more the balance tilts towards permitting the [governmental] employee to express himself." Guilloty Perez v. Pierluisi, 339 F.3d 43, 53 (1st Cir. 2003). If matters of public concern are not involved, the First Amendment value of the speech "is low, and a federal court is not the appropriate forum in which to review the wisdom of internal decisions arising therefrom." Jordan v. Carter, 428 F.3d at 72-73 (internal quotation marks and citation omitted). Whether an employee's statement addresses a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-148. The depth of the court's inquiry depends on how clearly the content of the speech relates to a matter of concern to the public. "Where a public employee speaks out on a topic which is clearly a legitimate matter of *inherent* concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the 'form and context' of the expression. On the other hand, public-employee speech on a topic which would not necessarily qualify, *on the basis of its content alone*, as a matter of inherent public concern (e.g., internal working conditions, affection only the speaker and co-workers), may require a more complete Connick analysis into the form and context of the public-employee expression." O'Connor v. Steeves, 994 F.2d 905, 913-914 (1st Cir. 1993) (emphases in original).

The first step in the analytical process requires the court to determine whether the expression at issue "was protected in the first place." Hennessy v. City of Melrose, 194 F.3d 237, 245 (1st Cir. 1999). Plaintiffs curiously do not identify with specificity any single statement that is deserving of First Amendment protection. Rather, they simply argue in categorical terms that their speech related to matters of public concern. Therefore, in addition to a review of over 300 pages of transcripts of recorded conversations, the court will focus on the statements highlighted by the defendants.

    a. Jordan

The Department's charges against Jordan primarily concerned his several requests that MacKay obtain confidential information on three persons of interest.[4] Plaintiffs appropriately do not appear to contend that these requests constituted "speech," let alone speech on matters of public concern. Nor can they reasonably argue that Jordan's statement to a sergeant, for which he was charged with insubordination, involved a topic

---

[4]In the first instance, while Jordan was an inpatient at a drug rehabilitation clinic, he called MacKay and asked him to obtain outstanding warrant information on two of his fellow patients. On a second occasion, Jordan asked MacKay for the RMV and Board of Probation records of an individual who he claimed had taken $2,500 from his sister to do a job, and then "never showed up." Jordan told MacKay that he was "trying to figure out what he's got for an address, I might have someone go say hi." He also said, "The Squid might come by." As the court commented during the January 2005 hearing, it can not seriously be disputed that the computerized searches were devoid of any matter of public concern. "Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." Houchins v. KQED, Inc., 438 U.S. 1, 15 (1978). The searches clearly were improper. "The CORI statute is designed to insure that sensitive criminal records are not improperly accessed and disseminated. Documents subject to the statute may not be distributed to anyone who is not 'CORI certified.'" Wagner v. City of Holyoke, 241 F. Supp. 2d 78, 86 n.5 (D. Mass. 2004). See also Galvin v. Town of Yarmouth, 470 F. Supp. 2d 10, 15 (D. Mass. 2007). MacKay was authorized to access CORI records; Jordan was not.

of concern to the public. Jordan said to the sergeant, "I got a nice big stiff cock for you."

    b. MacKay

Defendants charged MacKay with a longer litany of derogatory statements about senior commanders.[5] The majority of the statements were made in the aftermath of a murder at the Dudley Square MBTA station. MacKay discussed the murder with a number of fellow officers over the recorded line. The common theme of the discussion was an article that had appeared in the Boston Globe. In the article, a quotation attributed to Chief Carter implied that the murder might have been prevented had the Patrolmen's Union agreed to his patrol plan instead of stalling negotiations with the Department. Carter had circulated a Department-wide memorandum disavowing the accuracy of the article. He had also written to the Globe stating that portions of the article were false and demanding a retraction. MacKay stated in a number of recorded conversations that Chief Carter's quoted comment was "a nice missile you just sent across our bow," and that the Union "should answer with one, and then we're even." He also told fellow officers that Carter was a "fucking liar," that his policies were "fucking foolishness," that the command officers are "so fucking stupid it is not even funny," and that "you can't take any pride in this fucking

---

[5]MacKay was also charged with conducting two CORI checks other than those that he ran at Jordan's request. First, at the request of a civilian unknown to MacKay, he ran a license plate number and provided information about the vehicle's owner, including her address. The caller did not provide a reason for the request, nor did MacKay ask for one. Later, MacKay was speaking on the telephone with a friend while both were watching a television show. One of the contestants was a woman from Massachusetts. MacKay said, "She looks fucking nice." He conducted a computer search that revealed the woman's birthdate. MacKay then told his friend the address of the woman. "Oh, I know where that is," said MacKay's friend, "That must be an apartment, huh? . . . Dirty bitch."

6

shit hole." MacKay also spoke with several officers about their impressions that Carter was frequently absent from the job. Chief Carter was routinely referred to as "No Show Joe" in the conversations.[6]

MacKay also made disparaging remarks about other officers, including his superiors. MacKay stated that Carter had given Deputy Chief John Martino (Martino) too much discretion over vacation time scheduling. MacKay said, "[Carter] shouldn't be letting these fucking – fucking Martino run this place . . . . Martino [isn't] making any friends out here when he said we ain't changing the fucking patrol plan . . . . [Martino tightened vacation rules] just to fuck with you." MacKay was also charged with referring to fellow officers on numerous occasions as "retard," "fucking idiot," and "fucking kid." Finally, MacKay was charged with making discriminatory comments. Referring to gays getting married, MacKay repeated a talk show radio host's comment that "I hope they all drop dead." He also allegedly made a racially insensitive comment about a warrant check on a black male.

The performance of Chief Carter and other officers in command of the Department is arguably an issue of inherent public concern. "The diligence and lawfulness of a police department's activities are matters of great interest to the public." Guilloty Perez, 339 F.3d at 52. It is also beyond dispute that the safety of travel on the MBTA is a matter of public concern. As plaintiffs argue, their statements came at a time when the Department was under "intense scrutiny by the media and public at large due to the spike of violence at

---

[6]MacKay personally referred to Chief Carter as "No Show Joe" in at least one of the conversations.

train stations." Plaintiffs' Opposition, at 13. The question is whether the statements "went beyond mere concerns over the inner workings of the department." Guilloty Perez, 339 F.3d at 52. Because that can not be conclusively determined by the content of the statements alone, an inquiry into plaintiffs' motives is appropriate. See Mullin v. Town of Fairhaven, 284 F.3d 31, 38 (1st Cir. 2002) (a court must "examine the extent to which plaintiffs intended their speech to contribute to any public discourse, or if it simply reflected personal or [internal concerns.]"). See also Mihos v. Swift, 358 F.3d 91, 103 (1st Cir. 2004); Fabiano v. Hopkins, 352 F.3d 447, 454 (1st Cir. 2003). Any fair reading of the transcripts makes it plain that plaintiffs' comments were focused on internal working conditions in the Department, and on the relationship between management and the Department unions. Plaintiffs' claim that they were motivated by concern for the safety of the public is nothing more than litigation-inspired posturing. MacKay's preoccupation was with his personal reputation as a member of the Department: "We just look like idiots" and "retards." As MacKay asked rhetorically, "How do we look today in the paper and the radio, are we looking good? . . . Yeah RKO[7] really enjoyed us this morning, didn't they? . . . we look fucking ridiculous . . . ."

Nothing in the content of MacKay's "expression suggests a subjective intent to contribute to any such public discourse." O'Connor, 994 F.2d at 914. At all times, plaintiffs (primarily MacKay) were talking to fellow police officers in unguarded telephone conversations. A public employee does not necessarily relinquish his First Amendment rights if he "arranges to communicate privately with his employer rather than to spread his

---

[7]The reference is to WRKO, a popular local AM talk radio station.

views before the public." Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 415-416 (1979) (teacher met privately with her school principal to express her view that certain school policies were racist). But at no point did either plaintiff bring any of these alleged "issues of public concern" to the attention of their Department superiors. Although plaintiffs might have discussed issues of *potential* public interest, there is no evidence to suggest that their statements constituted anything more than barracks talk and griping and sniping about the internal workings of the Department. As for making general workplace complaints, "[s]uch conduct *itself* is not calculated to provide members of society with information necessary to make informed decisions about government operations, to disclose public misconduct, or to inspire public debate on a matter of significant public interest." Meaney v. Dever, 326 F.3d 283, 289 (1st Cir. 2003) (emphasis in original). Simply put, plaintiffs did not "seek to inform the public that [the Department] was not discharging its governmental responsibilities," nor did they "seek to bring to light actual or potential wrongdoing or breach of public trust." Connick, 461 U.S. at 148.

    In ruling on Chief Carter's interlocutory appeal, the First Circuit noted that

> [c]riticism of the chief and other management, as well as expressions of concern about safety at one of the MBTA passenger stations, could – depending upon the particulars of content, form and context – constitute a matter of legitimate public concern. Certainly, if either official misconduct or neglect of duties was asserted to be responsible for unsafe conditions for the general public, this would be a matter of public importance. If, however, the performance critiques concerned only matters of internal working conditions, and the discussion of 'safety issues' at the Dudley Station likewise reflected an employee workplace concern rather than the public interest, plaintiffs' constitutional claim would falter at the threshold inquiry.

Jordan, 428 F.3d at 73 (internal citation omitted). Here, plaintiffs' claim stumbles at the threshold, as they are "hard pressed to elevate the First Amendment stakes by invoking the interests of the community in a public discourse that they appear to have done so little to foster." Mullin, 284 F.3d at 39-40. Accordingly, defendants' motion for summary judgment will be ALLOWED.

2. The Pickering Balance Test

Even if the court were to assume, *arguendo*, that plaintiffs' speech touched on matters of public concern, the balancing test set forth in Pickering v. Bd. of Educ., 391 U.S. 563 (1968), would lead to the same result.[8] Under Pickering, the court must "arrive at a balance between the interests of [the employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 568. There are a number of considerations that factor into the analysis, including "whether [a] statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987). If a plaintiff is terminated because the defendant is concerned that tolerance of his statements would negatively affect governmental functions, the defendant has "weighty interests on [its] side of the

---

[8]The determination of whether speech was a motivating or substantial factor in an adverse employment action raises issues of fact the resolution of which ordinarily belongs to the jury. See Nethersole v. Bulger, 287 F.3d 15, 18-19 (1st Cir. 2002). Defendants concede that plaintiffs were disciplined for their speech. The issue of law for the court is whether their speech is entitled to any First Amendment protection at all.

10

Pickering scale." Mihos, 358 F.3d at 103. In the same vein, "insofar as self-interest is found to have motivated [a plaintiff's] speech, [his] expression is entitled to less weight in the Pickering balancing than speech on matters of public concern intended to serve the public interest." Mullin, 284 F.3d at 39.

"[T]he government as employer indeed has far broader powers than does the government as sovereign." Waters v. Churchill, 511 U.S. 661, 671 (1994) (plurality opinion).

> When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. . . . Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. . . . Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

Garcetti v. Ceballos, 126 S. Ct. 1951, 1958 (2006). Where, as in the Department, "close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." Connick, 461 U.S. at 151-152.

The importance of discipline and harmony is greater in the realm of a law enforcement agency than in other government entities. See Guilloty Perez, 339 F.3d at 53. "In quasi-military organizations such as law enforcement agencies, comments concerning co-workers' performance of their duties and superior officers' integrity can directly interfere with the confidentiality, esprit de corps, and efficient operation of the police department." Busby v. City of Orlando, 931 F.2d 764, 774 (11th Cir.1991). See also Shands v. City of Kennett, 993 F.2d 1337, 1344 (8th Cir. 1993) (police departments

have a need to "promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence."). Accordingly, "courts must be sensitive to the needs of law enforcement agencies in disciplining an employee whose expressive conduct interferes with these interests." Guilloty Perez, 339 F.3d at 53-54. Here, the derisive statements made by Jordan and MacKay had a palpable tendency to impact negatively on workers, supervisors, and the efficient functioning of the Department.

The First Amendment does not "require a public office to be run as a roundtable for employee complaints over internal office affairs." Connick, 461 U.S. at 149. Nor is it necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." Id. at 152. Clearly, the Department's interest in maintaining order and discipline among its officers was a strong interest that outweighed the plaintiffs' interest in complaining privately between themselves and to others about the perceived inadequacies of their superiors. This is not a case in which plaintiffs attempted to inform the public about serious safety issues, to blow the whistle on any observed wrongdoing, or to seek a forum with their superiors in order to air concerns about the morale or functioning of the workplace. "The limited First Amendment interest involved here did not require that [Chief Carter] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." Id. at 154.

## ORDER

For the foregoing reasons, defendants' motion for summary judgment is ALLOWED. The case will be closed.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE